384 P.2d 796

The **CONTINENTAL BANK AND TRUST COMPANY**, a corporation, Plaintiff and Appellant,

v.

Spencer C. **TAYLOR**, individually and as Bank Commissioner of the State of Utah, Defendant and Respondent,

State Farm Mutual Automobile Insurance Company, Amicus Curiae,

Harmon Motor Company, Amicus Curiae.

No. 9817.

Supreme Court of Utah.

Aug. 30, 1963.

& Milling Co., 6 Utah 2d 177, 308 P.2d 954.

Fabian & Clendenin, Bryce E. Roe, Peter W. Billings, Salt Lake City, for appellant.

A. Pratt Kesler, Atty. Gen., Raymond W. Gee, Chief Asst. Atty. Gen., Salt Lake City, for respondent.

Strong & Hanni, Salt Lake City, and Allen M. Taylor and David Shute, Milwaukee, Wis. for amicus curiae State Farm Mut. Auto. Ins. Co.

Louis H. Callister, Salt Lake City, for amicus curiae Harmon Motor Co.

DAY, District Judge.

This action arose upon the plaintiff-appellant, hereinafter referred to as the Bank, filing its complaint in the court below asking for a declaratory judgment under the provisions of Section 78–33–1, Utah Code Annotated 1953, et seq., to the effect that the provisions of Section 7–3–6, Utah Code Annotated 1953 do not prohibit certain practices of the Bank which were set out in the complaint. The complaint further alleged that the defendant, hereinafter referred to as the Commissioner, had advised the Bank that prosecutions and administrative sanctions would be imposed against the Bank for continuing such practices. The Commissioner in his answer in substance agreed with the facts of the Bank's practices as outlined in the complaint, and asked for a declaratory judgment to the effect that such practices were

in violation of Section 7–3–1, U.C.A.1953, et seq., particularly Section 7–3–6, and asked further that the Bank should be enjoined from engaging in such acts and practices. Both sides then moved for summary judgment under Rule 56 of Utah Rules of Civil Procedure.

Such motions were heard together by the trial court and considered upon an agreed statement of facts as contained in the pleadings and upon memoranda of authorities submitted. The trial court found and determined that the Commissioner was entitled to summary judgment against the Bank as prayed for, and the Bank's motion was denied. From such judgment the Bank appeals.

The facts as obtained from the pleadings and memoranda of the parties are as follows:

1. The plaintiff-appellant is a banking corporation organized and existing under the laws of the State of Utah, and as such is subject to supervision, examination and regulation by the defendant-respondent, who is the duly appointed, qualified and acting Bank Commissioner of the State of Utah.

2. In connection with its banking operations the Bank had established courses of dealing with various insurance agents under which the Bank furnished them with forms of bills of exchange or checks, promissory notes and chattel mortgages, interest rate charts, instruction sheets, return envelopes, credit statement forms, and advertising matter, all to be used by the agents in connection with plans which were advertised by the Bank as "Your one-stop automobile insurance and financing center," for the purpose of making bank loans for the purchase of automobiles and insurance on such automobiles.

3. It was the practice of the insurance agents who worked under the said course of dealing with the Bank, either at their offices or homes or at the office or place of business of the customer, to obtain from the customer a credit statement and pertinent information about the automobile to be purchased, which information was passed on to the Bank by the agent by telephone. At the Bank such information was entered on a credit application form and the Bank then made what it termed a credit check, and upon a determination, which was usually made within a few minutes, to approve or disapprove the loan, the Bank then notified the agent by telephone of such determination.

4. Upon being notified of the approval by the Bank, the agent then filled in the blanks on the appropriate forms, and had the customer execute the promissory note and chattel mortgage for the total of the loan from the Bank, i. e., (1) the purchase

price and charges on the automobile, (2) the insurance premiums, and (3) interest for the term of the loan. The interest charges were taken by the agent from the interest rate charts furnished to him by the Bank.

5. The agent also had the customer sign a bill of exchange or check drawn on the Bank payable to the seller of the automobile in the amount of the purchase price plus agreed charges, and another bill of exchange or check payable to the insurance company for the insurance premium. The appropriate checks were then delivered by the agent to the automobile dealer or seller and the insurance company respectively, with copies thereof and the original and duplicate of the note and chattel mortgage and copies of other appropriate documents delivered to the Bank. The original bills of exchange or checks were customarily received by the Bank in the ordinary course of business through the Salt Lake Clearing House as any other check drawn on the Bank, whereupon they were paid.

6. All of the forms, charts and instruction sheets referred to were furnished by the Bank to the agents. The loan application forms, the checks, the interest charts, etc., all indicate that they are the forms of the Bank. The instructions furnished by the Bank to the agents consists of five letter-sized sheets, pertinent portions of which are as follows:

"THE CONTINENTAL BANK & TRUST COMPANY
"SALT LAKE CITY, UTAH
"BANK—AGENT PLAN
"March 30, 1962

"*INSTRUCTIONS*

"The following procedure will be followed in arranging financing for the purchase of a new or used car:

"*CREDIT STATEMENT*

"The credit statement will be filled out completely. Then telephone the Continental Bank—Elgin 5–6631 and ask for the Bank-Agent Department and furnish all the necessary information including the details of the car purchase. An immediate credit investigation will be made and reply given within thirty minutes. * * *

"*APPROVAL*

"When the application is approved, the agent will complete all necessary papers and mail them immediately to BANK-AGENT INSTALLMENT LOAN DEPARTMENT, CONTINENTAL BANK AND TRUST COMPANY, P. O. BOX 1770, SALT LAKE CITY, UTAH. Business reply envelopes provided.

"*AMOUNT TO FINANCE*

"Figure the monthly payments by use of the proper rate chart, figured on

**374**

the deferred balance after down payment plus the insurance premium for the term of the loan.  Example as follows:  *  *  *

## "PROMISSORY NOTE AND CHATTEL MORTGAGE

"The following procedure should be followed in filling in the blank space on the note and chattel mortgage form: *  *  *

## "REGISTRATION OF AUTOMOBILE

"Give purchaser the third copy of note and chattel mortgage for delivery to the dealer for proper registration of car and lien for the Bank.  *  *  *

## "CHECK FOR CAR—GREEN

"This check is used for the purchase of the automobile.  The check will be: *  *  *

## "CHECK FOR INSURANCE PREMIUM—PINK

"The check for the insurance premium will be filled out the same as the check for the car, except  *  *  *

## "PAPERS TO BE SENT TO THE BANK

"It is imperative that the following papers be in the hands of the Bank-Agent Division Installment Loan Department, The Continental Bank & Trust Company, 200 South Main, Salt Lake City, Utah, without delay the following morning:

"1.  Credit Statement (unless in bank's possession)

"2.  Note and Chattel Mortgage—original and duplicate

"3.  Check Copies—for car and insurance premium

"4.  Original copy of binder if premium is not financed and, unless policy will be sent to the Bank within ten days.

## "PRIVATE SALE OF CARS

"It will be necessary to have private sales of cars handled in the Bank.  It will, therefore, be necessary to have the purchaser and the seller come to the Bank, where the transaction can be completed.

"Either the Central Branch at 1575 South Main Street or the Main Office at 2nd South and Main can handle such transactions.  Free Parking.

## "VERIFY THE SALE WITH THE DEALER PRIOR TO ISSUING CHECKS:

"The following details must be verified by the Agent:  *  *  *

## "OUT OF STATE SALES

*     *     *     *     *     *

"If you have any questions, please telephone me at Elgin 5–6631.

"(signed)—————————————
            "Assistant Vice President."

Section 7–3–3, Utah Code Annotated 1953 provides as follows:

"Any corporation holding itself out to the public as receiving money on deposit, whether evidenced by certificate, promissory note or otherwise, shall be considered as doing a banking business and shall be subject to the provisions of this chapter as to such business."

Section 7–3–6, Utah Code Annotated 1953 as amended by Section 4, Chapter 8, Laws of Utah 1953, and Section 1, Chapter 7, Laws of Utah 1957, provides:

"The business of every bank shall be conducted only at its banking house and every bank shall receive deposits and pay checks only at its banking house except as hereinafter provided.

"With the consent of the bank commissioner and the approval of the governor, any bank having a paid-in capital and surplus of not less than $60,000 may establish and operate one branch for the transaction of its business; * * * provided, that for each additional branch established there shall be paid in an additional $60,000 (capital and surplus).

"All banking houses and branches shall be located either within the corporate limits of a city or town, or within unincorporated areas of a county in which a city of the first class is located.

"Except in cities of the first class, or within unincorporated areas of a county in which a city of the first class is located, no branch bank shall be established in any city or town in which is located a bank or banks, state or national, regularly transacting a customary banking business, unless the bank seeking to establish such branch shall take over an existing bank. No unit bank organized and operating at a point where there are other operating banks, state or national, shall be permitted to be acquired by another bank for the purpose of establishing a branch until such bank shall have been in operation as such for a period of five years.

"A separate application must be filed for each branch location desired and the fee for filing such application shall be the sum of $50 to be paid at the time of filing and such fee shall be paid regardless of whether the application is granted or refused.

"The term 'branch' as used in this act shall be held to include any branch bank, branch office, branch agency,

additional office, or any branch place of business at which deposits are received or checks paid or money lent.

"Any bank desiring to establish one or more branches or offices shall file a written application therefor in such form and containing such information as the bank commissioner may require. No bank shall be permitted to establish any branch or office until it shall first have been shown to the satisfaction of the bank commissioner and the governor that the public convenience and advantage will be subserved and promoted by the establishment of such branch or office and the bank commissioner may by order permitting the establishment of such branch or office designate and limit the character of work and service which may therein be performed.

"No branch shall be established at a location outside the corporate limits of a city or town in such close proximity to an established bank or branch as to unreasonably interfere with the business thereof.

"Any corporation or officer thereof violating any of the provisions of this section is guilty of a misdemeanor."

Section 7–3–6.3, U.C.A.1953 (Section 3, Chapter 8, Laws of Utah 1953) provides:

"From and after the effective date of this act [March 13, 1953] no unit bank and no branch bank shall be established or authorized to conduct a banking business except as hereinbefore in section 7–3–6 expressly provided."

The Bank contends that the making of loans by a bank at places other than at its banking house is not prohibited or restricted by the statutes, and that in any event, in connection with the practices here considered, the loans are not made outside of its banking house, but that the loan is not actually made until the bill of exchange or check is presented to the Bank for payment. The Bank contends further that the agents referred to herein are not acting as agents of the Bank in these practices, and questions: "If the plaintiff is maintaining 'branches,' where are they?"

The Commissioner contends that the activity on the part of the Bank as referred to herein constitutes "branch banking" within the meaning and prohibition of the statutes referred to; that the agents are in fact agents of the Bank in conducting its business; that the Bank's credit has been extended to the customer upon the execution and handling of the various documents which takes place at the office or home of the agent or the office or home of the customer or even upon the street; and the Commissioner answers the Bank's question regarding the whereabouts of its "branches" by responding that mobile or door-to-door branch banking is as violative

of the statute as though specific street addresses for such "branches" were had.

This Court is inclined to and does agree generally with the contentions of the Commissioner in this case.

█ While there is no contention that the Bank makes any payment to the respective agents for their services in the handling of the matters and practices referred to herein, it is difficult to see where the Bank could secure better service or handling as to each particular transaction if in fact the Bank did pay for such services and handling. The existence of an agency relationship does not require or depend upon the payment of a wage or fee by the principal to the agent, and it does not require or depend upon a continuous activity on the part of the agent for the principal. As is noted in appellant's brief herein, agency is defined by the American Law Institute Restatement of Agency 2d, Section 1, as follows:

"Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act."

Certainly here there was the manifestation of consent by the Bank to the insurance agents that such insurance agents should act in a fiduciary relationship on behalf of the Bank and subject to its control, and the insurance agents consented to and in fact did so act.

It is noted that with regard to the sales of cars by dealers, the Bank permitted the agents to handle the transactions wherever they desired, but that with regard to the sale of cars by private individuals the Bank's instruction sheet provided:

"It will be necessary to have private sales of cars handled *in the Bank*. It will, therefore, be necessary to have the purchaser and the seller come *to the Bank, where the transaction can be completed*. Either the Central Branch at 1575 South Main Street or the Main Office at 2nd South and Main can handle such transactions." (Emphasis added.)

There is no indication in the instruction sheets or elsewhere that the transaction in a private sale by an individual would be handled any differently "in the Bank" itself than a sale by a car dealer handled in the insurance agent's office. The obvious basis for this requirement of coming "to the Bank" is that the Bank could foresee possible complications in a transaction with a private individual that would probably not arise in a transaction with an automobile dealer, and the Bank could better handle such matters in its own banking house.

██ This is a safety factor which the Bank in its wisdom has included in its instruction sheets to the agents handling

its automobile and insurance premium loans under these circumstances. We think the legislature in its wisdom also had a safety factor in mind in enacting the provisions of Sections 7-3-6 and 7-3-6.3, U.C.A.1953 as amended. A bank deals as a fiduciary with funds of its depositors, and we think the requirements of the statutes are wise and proper that those places at which a bank receives deposits or cashes checks or lends money should be only those places which have been established pursuant to the statutory requirements. There are safety factors in these statutory requirements which benefit the Bank and the depositors whose funds are being handled.

It is noted that the instruction sheet refers to the " * * * Bank, where the transaction can be completed." It thus is apparent that "the transaction can be completed" in the "Bank." How is this to be accomplished? By the execution and delivery to the Bank of the note and chattel mortgage by the customer directly and by the extension of credit by the Bank to the customer—but not by the mailing of the checks to the car dealer or the insurance company, and not by having the checks returned to the Bank for payment. The transaction would be completed while the customer is "in the Bank" whether in fact the customer ever bought the car or paid any insurance premiums.

Let it be presumed in a dealer transaction that all of the directions on the instruction sheets are handled exactly as there set forth with the checks being mailed to the car seller and to the insurance company; but suppose further, that the recipients of the checks hold them for five days or 50 days or five months—is the "money lent" when the checks are later negotiated through the usual channels of trade and come back to the Bank through the Salt Lake Clearing House for payment—or is the "money lent" when the note and mortgage are received through the mail by the Bank at its banking house—or is the "money lent" when the note and mortgage are executed by the customer and delivered to the representative of the Bank and the customer is authorized by the Bank to draw and does in fact draw checks thereon.

It must be recognized that in the channels of commerce, there is "money lent" without the actual delivery of coins or currency by the lender to the borrower. In an ordinary bank loan it would not be unusual that the Bank would merely give credit to the borrower in his checking account, and the borrower would in turn draw checks on the account when he desired to do so, and no currency or coins would ever be involved in the transaction at all. In fact, it would not be too unusual for a borrower to make a loan from a bank, hold the proceeds of the loan in his account with the same bank, and then repay the bank without in fact ever drawing checks on such credit. It is doubted that the Bank would contend that

unless the borrower actually drew on the funds that there was no "money lent."

We consider the transaction completed and the "money lent" at the time (1) the executed note and mortgage are delivered to the representative of the Bank, and whether he is an insurance agent and whether or not he is paid by the Bank are immaterial factors, and (2) the customer is authorized by the Bank to draw checks thereon.

We consider the language of Section 7–3–6, U.C.A.1953 as amended, referring to and defining the term "branch" as meaning and including any office or place of business where "deposits are received or checks paid or money lent" by the Bank. If such office or place of business is established and conducted as provided by Section 7–3–6, U.C.A.1953 as amended, it is proper and lawful. If such office or place of business is not so established or conducted, then it is not proper and it is not lawful.

The judgment of the lower court is affirmed. Each party to stand his own costs.

HENRIOD, C. J., and CROCKETT and WADE, JJ., concur.

McDONOUGH, J., concurs in the result.

CALLISTER, J., having disqualified himself, did not participate herein.