INDEPENDENT BANKERS ASSOCIA-
TION OF AMERICA, a corporation,
et al., Appellees,

v.

James E. SMITH, Comptroller of the
Currency of the United
States, Appellant.

No. 75–1786.

United States Court of Appeals,
District of Columbia Circuit.

Argued 25 Nov. 1975.

Decided 23 March 1976.

Michael Kimmel, Atty., Dept. of Justice, Washington, D. C., with whom Rex E. Lee, Asst. Atty. Gen., Earl J. Silbert, U. S. Atty., Ronald R. Glancz, Atty., Dept. of Justice, and C. Westbrook Murphy, Atty., Washington, D. C., were on the brief, for appellant. Robert E. Kopp, Atty., Dept. of Justice, Washington, D. C., also entered an appearance for appellant.

Meyer Eisenberg, Washington, D. C., with whom Horace R. Hansen, St. Paul, Minn., and Leonard J. Rubin, Washington, D. C., was on the brief, for appellees.

William J. Brown, Atty. Gen. of the State of Ohio, Columbus, Ohio, filed a brief on behalf of the State of Ohio ex rel. F. Scott O'Donnell, Superintendent of Banks as amicus curiae urging affirmance.

James F. Bell and Peter B. Work, Washington, D. C., filed a brief on behalf of the Conference of State Bank Supervisors as amicus curiae.

A brief was filed on behalf of the State of Oklahoma as amicus curiae urging affirmance.

Before WRIGHT, LEVENTHAL and WILKEY, Circuit Judges.

Opinion for the Court filed by Circuit Judge WILKEY.

WILKEY, Circuit Judge: *

This is an appeal by the Comptroller of the Currency from a judgment of the United States District Court for the District of Columbia (Robinson, J.) declaring unlawful and enjoining an interpretive ruling of the Comptroller relating to the use of electronic funds transfer systems by national banks.[1] Appellant Comptroller challenges the district court's memorandum and order by arguing (1) that plaintiffs' challenge to his interpretive ruling is not ripe for judicial resolution, (2) that, in any event, he correctly ruled that customer-bank communication terminals are not "branches" under the National Bank Act,[2] and (3) that the district court erred in granting an injunction against his ruling. We agree with none of these contentions and, therefore, affirm the judgment of the district court.

## I. FACTUAL BACKGROUND

On 11 December 1974 the Comptroller of Currency issued an interpretive ruling in which he construed the National Bank Act as permitting national banks to establish customer-bank communication terminals (CBCT's) apart from their main offices and branches.[3] The Comptroller's ruling required national banks to give the Comptroller written notice of proposed CBCT operations thirty days before terminals were established, and a later amendment imposed a fifty mile geographical restriction on exclusive (unshared) terminals.[4]

CBCT's are manned or unmanned electronic terminals which, depending on how the machines are programmed, permit an existing bank customer to accomplish various financial transactions, including the deposit and withdrawal of funds and the transfer of funds between accounts. These automated tellers may be installed off bank premises in shopping centers, supermarkets, stores, factories, office buildings, etc., and any approved bank customer with a plastic "key card" can effect transactions at these terminals. Some CBCT's are connected directly to their bank's central computer, while others record transactions on electronic tapes which are later decoded or read by a machine at the bank. Most CBCT's which accept deposits and dispense funds require some periodic transportation of funds to and from the bank.[5]

The central, substantive issue in this case is whether CBCT's are bank "branches" under the National Bank Act. If they are, then CBCT's are subject to the restrictions of the Act governing branching; if they are not, national banks can install and operate CBCT's anywhere (even across state lines)

* OUTLINE OF OPINION

I. Factual Background (P. 924)

II. Ripeness (P. 926)
 A. Fitness for Judicial Decision (P. 927)
 1. A Purely Legal Issue (P. 927)
 2. Judicial Efficiency (P. 928)
 3. Finality (P. 928)
 B. Hardship to the Parties (P. 929)

III. Validity of the Comptroller's Ruling (P. 930)
 A. Legislative History (P. 930)
 B. The Concepts of Federalism and Competitive Equality (P. 932)
 C. The Federal Definition of "Branch" (P. 938)
 1. Deposits Received (P. 938)
 2. Checks Paid (P. 942)
 3. Money Lent (P. 945)
 4. Applying the Federal Definition (P. 948)

IV. Injunctive Relief (P. 950)
 A. Irreparable Harm (P. 950)
 B. Public Interest (P. 950)

V. Conclusion (P. 951)

1. *Independent Bankers Ass'n v. Smith,* 402 F.Supp. 207 (D.D.C.1975).

2. 12 U.S.C. § 1 *et seq.* (1970).

3. 12 C.F.R. § 7.7491 (1975).

4. There are no mileage limitations on CBCT's shared with other financial institutions in the trade area.

5. Those that do not are manned, point-of-sale (POS) terminals. These terminals are operated by an employee of a third party, *e. g.,* a department store or supermarket. In a typical POS transaction, the bank customer presents the terminal operator with the information necessary to execute a desired transaction, and the appropriate instructions and information are relayed electronically to the bank. Then, the bank, through transfers between the customer's and the third party's accounts, verifies and confirms the transaction.

subject only to the thirty day filing requirement and the fifty mile geographical limitation of the Comptroller's ruling. For our purposes, the important restrictions of the Act applicable to "branches" are found in sections 36(c), 36(d) and 51. Section 36(c) outlines the terms under which a national bank may establish and operate a new branch. First, the bank must secure the approval of the Comptroller. Second, the establishment and operation of the branch must be expressly authorized to state banks under state law. Third, the branch must comply with state law restrictions governing location and state law requirements as to minimum capital stock and surplus.[6] In short, section 36(c) provides "that a 'branch' may be established only when, where, and how state law would authorize a state bank to establish and operate such a branch . . . ."[7] The other two sections mentioned above, sections 36(d) and 51, set an additional minimum capital requirement for national banks and their branches.[8]

The Comptroller's ruling states that CBCT's are not "branches" within the meaning of section 36(f) of the National Bank Act.[9] Under this interpretation, the restrictions of sections 36(c), 36(d), and 51 are totally circumvented. The ruling would permit national banks to install and operate

---

6. Section 36(c) provides, in pertinent part, as follows:

> A national banking association may, with the approval of the Comptroller of the Currency, establish and operate new branches: (1) Within the limits of the city, town or village in which said association is situated, if such establishment and operation are at the time expressly authorized to State banks by the law of the State in question; and (2) at any point within the State in which said association is situated, if such establishment and operation are at the time authorized to State banks by the statute law of the State in question by language specifically granting such authority affirmatively and not merely by implication or recognition, and subject to the restrictions as to location imposed by the law of the State on State banks. . . .
> [N]o such association shall establish a branch outside of the city, town, or village in which it is situated unless it has a combined capital stock and surplus equal to the combined amount of capital stock and surplus, if any, required by the law of the State in which such association is situated for the establishment of such branches by State banks, or, if the law of such State requires only a minimum capital stock for the establishment of such branches by State banks, unless such association has not less than an equal amount of capital stock.

12 U.S.C. § 36(c) (1970).

7. *First Nat'l Bank v. Dickinson (Plant City),* 396 U.S. 122, 130, 90 S.Ct. 337, 341, 24 L.Ed.2d 312, 318 (1969); *accord, First Nat'l Bank of Logan v. Walker Bank & Trust Co.,* 385 U.S. 252, 261–62, 87 S.Ct. 492, 497, 17 L.Ed.2d 342, 349 (1966).

8. Sections 36(d) and 51 provide, in relevant part, as follows:

> The aggregate capital of every national banking association and its branches shall at no time be less than the aggregate minimum capital required by law for the establishment of an equal number of national banking associations situated in the various places where such association and its branches are situated.

12 U.S.C. § 36(d) (1970).

> [N]o national banking association shall be organized with a less capital than $100,000, except that such associations with a capital of not less than $50,000 may be organized in any place the population of which does not exceed six thousand inhabitants. No such association shall be organized in a city the population of which exceeds fifty thousand persons with a capital of less than $200,000, except that in the outlying districts of such a city where the State laws permit the organization of State banks with a capital of $100,000 or less, national banking associations now organized or hereafter organized may, with the approval of the Comptroller of the Currency, have a capital of not less than $100,000. No such association shall hereafter be authorized to commence the business of banking until it shall have a paid-in surplus equal to 20 per centum of its capital . . . .

12 U.S.C. § 51 (1970).

9. Section 36(f) provides as follows:

> The term "branch" as used in this section shall be held to include any branch bank, branch office, branch agency, additional office, or any branch place of business located in any State or Territory of the United States or in the District of Columbia at which deposits are received, or checks paid, or money lent.

12 U.S.C. § 36(f) (1970).

CBCT's without reference to, or limitation by, state laws regulating or prohibiting branching by state-chartered banks. Also, insofar as CBCT's are concerned, it would permit national banks to ignore the minimum capital requirements established by sections .36(d) and 51. The ruling does not provide for public notice of the thirty-day filings; nor is there any requirement for approval by the Comptroller, as there would be for the establishment of a traditional branch.[10] As of 9 July 1975 twenty-eight national banks in seventeen states had filed notices of intention to establish 155 CBCT's in accordance with the Comptroller's ruling.[11]

On 20 January 1974 plaintiff-appellee, Independent Bankers Association of America (IBAA), filed a petition asking the Comptroller (1) to repeal his interpretive ruling and (2) to conduct formal rulemaking proceedings under the Administrative Procedure Act. IBAA is a nonprofit Minnesota corporation representing over 7300 commercial banks. After the Comptroller denied both requests, IBAA, ten state-chartered banks, and an individual bank customer filed the complaint in this case and Robert A. Mampel, Commissioner of Banks for the State of Minnesota, joined as an additional party plaintiff. The Comptroller then moved to dismiss the action on grounds of nonjusticiability or, in the alternative, for summary judgment on the merits, and plaintiffs filed a cross-motion for summary judgment.

In response to these motions, the district court dismissed several state bank plaintiffs (who were not within fifty miles of a proposed CBCT) and the individual plaintiff for lack of standing. The court found that all other plaintiffs satisfied the requirements for standing to sue and that their challenge to the Comptroller's ruling presented a justiciable case or controversy. On the merits, the district judge ruled that, within the meaning of section 36(f) of the National Bank Act, a CBCT was a "branch bank, branch office, branch agency, additional office, or any branch place of business . . . at which deposits are received, or checks paid, or money lent." Accordingly, he held the Comptroller's ruling null and void, permanently enjoined further implementation of the ruling, and rescinded any authority given to national banks by the ruling. On 4 August 1975 the district court denied the Comptroller's motion for a stay of the injunction pending appeal, and on 10 October 1975 this court denied a similar motion.

## II. RIPENESS

While standing to sue focuses on the parties before the court, ripeness asks whether the issues presented by those parties are appropriate for judicial review at this time. After resolving the threshold question of standing, the district court below correctly held,

[A]lthough the Comptroller labelled his ruling "interpretive" and has indicated his intention to monitor the development of CBCT's, the ruling represents the definitive position of the Comptroller on this issue and the challenge presented herein "raises a clearcut legal issue susceptible of judicial solution."[12]

■ In *Abbott Laboratories v. Gardner*,[13] the leading case on ripeness, the Supreme Court articulated two policy objectives un-

---

10. *See* 12 C.F.R. §§ 5.1–.14 (1975).

11. Stipulation of Facts No. 21 in *Independent Bankers Ass'n v. Smith*, 402 F.Supp. 207 (D.D.C.1975), Appendix (App.) at 47a.

12. *Independent Bankers Ass'n v. Smith*, 402 F.Supp. at 208 (footnote omitted), *citing Toilet*

*Goods Ass'n v. Gardner*, 360 F.2d 677, 684 (2d Cir. 1966), *aff'd*, 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967) *and National Motor Freight Ass'n v. United States*, 268 F.Supp. 90 (D.D.C. 1967), *aff'd*, 393 U.S. 18, 89 S.Ct. 49, 21 L.Ed.2d 19 (1968).

13. 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681, 691 (1967).

derlying the ripeness doctrine: (1) avoiding premature adjudications which could embroil the courts in abstract debates over administrative policy; and (2) protecting the agencies from judicial intervention before administrative decisions are formalized and felt in a concrete way by the affected parties. The Court also announced a two-fold test for ripeness requiring courts "to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." [14]

### A. Fitness for Judicial Decision

While deciding in favor of reviewability in *Abbott Laboratories,* Justice Harlan found three factors controlling on the issue of fitness for judicial review—these same factors emphasize the correctness of the district court's decision:

1. *A Purely Legal Issue*—First, Justice Harlan recognized that "the issue tendered is a purely legal one: whether the statute was properly construed by the Commissioner . . . ," [15] *i. e.,* whether the statutory term "prominently" authorized the Commissioner to promulgate the challenged regulations. In the instant case the issue facing the district court was strikingly similar: Did the Comptroller act within the scope of his delegated authority when he construed the statutory definition of "branch" to exclude the CBCT operations authorized by his ruling? It is well settled that similar issues of delegated authority and statutory interpretation raise "purely legal" questions.[16]

The Comptroller now argues that the issue before the district court was not purely legal. He contends that "there is a very definite problem of identifying and refining pertinent facts with respect to how particular CBCT's operate, the differences in their operation, their varying and diverse functions, how they affect the plaintiffs, and their legal status under State law." [17] This is somewhat—but not completely—inconsistent with appellant's position in the district court where he moved to dismiss the action on grounds of ripeness or, in the alternative, for summary judgment on the merits. By submitting the case for summary judgment the Comptroller necessarily argued that there was no genuine issue as to any material fact and that he was entitled to judgment as a matter of law.[18] Moreover, the district court properly relied on a stipulation of facts where all parties agreed that

> [t]he Comptroller's ruling authorizes one or more of the following banking functions to be performed by electronic devices or machines:
>
> (a) Receive cash or checks in accordance with a request or instruction by the customer; or
>
> (b) Dispense cash in accordance with a request or instruction by the customer; or
>
> (c) To received from a customer:
>
> (1) a request for a withdrawal of funds either from the customer's deposit account or from a previously authorized line of credit; or
>
> (2) an instruction that the bank receive funds or transfer funds for the customer's benefit.[19]

---

14. *Id.* at 149, 87 S.Ct. at 1515, 18 L.Ed.2d at 691.

15. *Id.*

16. *See, e. g., Toilet Goods Ass'n v. Gardner,* 387 U.S. 158, 163, 87 S.Ct. 1520, 1524, 18 L.Ed.2d 697, 701 (1967); *Citizens Communication Center v. FCC,* 145 U.S.App.D.C. 32, 36, 447 F.2d 1201, 1205 (1971); *National Automatic Laundry & Cleaning Council v. Shultz,* 143 U.S.App.D.C. 274, 280, 443 F.2d 689, 695 (1971).

17. Brief for Appellant at 11.

18. *See* Fed.R.Civ.P. 56(c).

19. Stipulation of Facts No. 19 in *Independent Bankers Ass'n v. Smith,* 402 F.Supp. 207 (D.D. C.1975), App. at 46a. In his memorandum and order Judge Robinson stated,

> Although the ruling does not contain a precise definition of a CBCT, it has been stipulated that a CBCT permits an existing bank customer to initiate transactions resulting in a cash withdrawal from his account, a crediting of funds to his account, a transfer between his checking account and savings account, and payment transfers from his

The Comptroller argues that, because there are several types of CBCT's and because his interpretive ruling is framed in general terms, we must await a more specific fact situation before we can properly adjudicate the validity of his ruling. Admittedly, there are several different kinds of CBCT's which perform divers functions. Nevertheless, it is also true that all CBCT's perform at least one of the three functions of branch banks listed in section 36(f), and that "since § 36(f) is phrased in the disjunctive, the offering of any one of the three services mentioned in that definition will provide the basis for finding that 'branch' banking is taking place." [20] Therefore, the Comptroller's argument that "a case-by-case review of particular CBCT's is called for in order to establish the legal parameters of when, if at all, a CBCT is a branch . . . ." [21] misses the mark entirely. The district court properly limited its focus to the illegality of the Comptroller's ruling. Because all CBCT's perform one of the branch banking functions described in section 36(f), it was unnecessary to explore the particular capacities of individual units. There is no problem of identifying or refining pertinent facts insofar as this court is asked to consider the validity of the Comptroller's interpretation of his governing statute. [22]

2. *Judicial Efficiency*—In *Abbott Laboratories* immediate review was "calculated to speed enforcement. If the Government prevail[ed], a large part of the industry [was] bound by the decree; if the Government [lost], it [could] more quickly revise its regulation." [23] In other words, immediate review was calculated to avoid a multiplicity of litigation. Similarly, in the present case judicial economy is again served by our finding of ripeness. In effect, the Comptroller argues that plaintiffs must file a separate lawsuit against each national bank noticing a proposed CBCT. [24] This approach flies directly in the face of efficient judicial administration; there is no sound reason why the Comptroller's ruling cannot be tested in this action. Also, our decision may assist other courts which are presently struggling with this same issue, and thereby prevent further duplication of legal effort and expense. [25]

3. *Finality*—In *Abbott Laboratories* Justice Harlan explained, "The regulation challenged here, promulgated in a formal manner after announcement in the Federal

account into accounts maintained by other bank customers.
*Independent Bankers Ass'n v. Smith*, 402 F.Supp. at 209–210. Also, the notices of intention to establish CBCT's filed with the Comptroller by national banks specify and describe the functions to be performed by each terminal. *See, e. g.*, Exhibit E. to Plaintiff's Memorandum in Support of Motion for Summary Judgment in *id.*, App. at 33a–37a.

**20.** *First National Bank v. Dickinson (Plant City)*, 396 U.S. at 135–36, 90 S.Ct. at 344, 24 L.Ed.2d at 320–321.

**21.** Brief for Appellant at 13.

**22.** In another case involving this same legal issue (*i. e.*, whether CBCT's are "branches" within the meaning of section 36), Judge Skopil of the United States District Court for the District of Oregon held,

There is no substantial factual dispute, for the decision depends entirely upon the proper interpretation of state and federal branching law. Summary judgment is appropriate.
*Independent Bankers v. Camp*, 357 F.Supp. 1352, 1354 (D.Or.1973). *See also National Au-*

*tomatic Laundry & Cleaning Council v. Shultz*, 143 U.S.App.D.C. at 280, 443 F.2d at 695.

**23.** *Abbott Laboratories v. Gardner*, 387 U.S. at 154, 87 S.Ct. at 1518, 18 L.Ed.2d at 694.

**24.** As of 31 July 1975 forty national banks had notified the Comptroller of their intention to install and operate 185 CBCT's. Brief for Appellees at 12 n. 7.

**25.** *See Ohio ex rel. O'Donnell v. Smith*, No. C–1–75–153 (S.D.Ohio, filed 30 April 1975); *Oklahoma ex rel. State Banking Bd. v. Utica Nat'l Bank & Trust Co.*, 409 F.Supp. 71 (N.D. Okla. 1975), *notice of appeal filed*, 10th Cir., 23 Feb. 1976; *Illinois ex rel. Lignoul v. Continental Ill. Nat'l Bank & Trust Co.*, 409 F.Supp. 1167 (N.D.Ill. 1975), *appeals docketed*, Nos. 76–1083 to 76–1086, 7th Cir., 27 Jan. 1976; *Missouri ex rel. Kostman v. First Nat'l Bank*, 405 F.Supp. 733 (E.D.Mo. 1975), *appeal docketed*, No. 76–1056, 8th Cir., 21 Jan. 1976; *Colorado ex rel. State Banking Bd. v. First Nat'l Bank*, 394 F.Supp. 979 (D.Colo.1975), *appeals docketed*, Nos. 75–1523, 75–1611, & 75–1612, 10th Cir., 17 July 1975 (oral argument scheduled for 25 Mar. 1976).

Register and consideration of comments by interested parties is quite clearly definitive. There is no hint that this regulation is informal . . . or tentative." [26] The Comptroller's interpretive ruling was not issued after formal notice-and-comment hearings, but judging from the Comptroller's negative response to IBAA's request for such rulemaking procedures, his ruling is every bit as "definitive" as the Federal Drug Administration regulation encountered in *Abbott Laboratories, i. e.,* administrative reconsideration of the ruling seems quite unlikely. Recognizing this, the district judge ruled that although the Comptroller labeled his ruling "interpretive" and indicated his intention to monitor the development of CBCT's, his ruling represented his "definitive position" on the issue and plaintiffs' challenge raised "a clearcut legal issue susceptible of judicial solution." [27] This analysis comports with the "flexible" and "pragmatic" view of finality expressly approved by the Supreme Court in *Abbott Laboratories.*[28] Furthermore, this court has frequently held that an agency's interpretation of its governing statute, with the expectation that regulated parties will conform to and rely on this interpretation, is final agency action fit for judicial review.[29]

### B. *Hardship to the Parties*

■ Turning to the second prong of the *Abbott* ripeness test, we must balance the hardships to the parties of withholding court consideration. The ultimate question is whether the immediate harm to plaintiffs caused by the Comptroller's ruling outweighs the advantage of allowing the Comptroller to consider the problem more fully and the disadvantage of having a court decide issues which might otherwise become more sharply defined. Since here the latter two factors are almost without weight, this is not a particularly difficult balancing task.

■ The Comptroller argues that appellees "have not demonstrated any hardship to themselves if judicial review is deferred until such time as their challenge of CBCT's arises in a concrete factual setting." [30] To the contrary, continuing reliance on the Comptroller's ruling by national banks could create an acute competitive disadvantage for state-chartered banks located in states where off-premises CBCT's are not permitted under state law. Absent the district court's injunction, national banks would already have hundreds of off-premises CBCT's operating throughout the country. Also, without the injunction below, this court would have been forced to consider the enormous economic waste involved in a decision that these terminals constitute "branches" and, therefore, must be dismantled.

On the other side of the scale, we find little, if any, hardship. It seems that the Comptroller and the national banks which he regulates can only profit from an early determination that eliminates the cloud of uncertainty surrounding off-premises CBCT's. At the district court level, either way the court decides the issue of "branchness", the affected parties are notified be-

---

**26.** 387 U.S. at 151, 87 S.Ct. at 1517, 18 L.Ed.2d at 693 (footnote and citations omitted).

**27.** *Independent Bankers Ass'n v. Smith*, 402 F.Supp. at 208 (footnote omitted), *citing Toilet Goods Ass'n v. Gardner*, 360 F.2d 677, 684 (2d Cir. 1966), *aff'd*, 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967) *and National Motor Freight Ass'n v. United States*, 268 F.Supp. 90 (D.D.C. 1967), *aff'd*, 393 U.S. 18, 89 S.Ct. 49, 21 L.Ed.2d 19 (1968). Even after the district court's decision, the Comptroller still refuses to accept *branch* applications for CBCT's. Brief for Appellees at 12.

**28.** 387 U.S. at 149–50, 87 S.Ct. at 1515, 18 L.Ed.2d at 691–692, *citing United States v.*

*Storer Broadcasting Co.*, 351 U.S. 192, 198, 76 S.Ct. 763, 768, 100 L.Ed. 1081, 1088 (1956); *Frozen Food Express v. United States*, 351 U.S. 40, 76 S.Ct. 569, 100 L.Ed. 730 (1956); *and CBS v. United States,* 316 U.S. 407, 418–19, 62 S.Ct. 1194, 1200–1201, 86 L.Ed. 1563, 1571 (1942).

**29.** *See, e. g., Fidelity Television v. FCC,* 163 U.S.App.D.C. 441, 502 F.2d 443 (1974); *Citizens Communications Center v. FCC,* 145 U.S. App.D.C. 32, 36, 447 F.2d 1201, 1206 (1971); *National Automatic Laundry & Cleaning Council v. Shultz,* 143 U.S.App.D.C. at 283, 443 F.2d at 698.

**30.** Brief for Appellant at 18.

fore they have detrimentally relied to any great extent on the Comptroller's ruling, and, if necessary, the Comptroller can quickly revise his regulations to conform with the court's decision. The basic point is that under these circumstances it would have been unfair to require state-chartered banks to suffer competitive disadvantages vis-à-vis national banks in order to challenge the legality of the Comptroller's action. Moreover, as we have previously noted, the legal issue in this case is sharply defined and the Comptroller's ruling represents a definitive position which is not likely to change. Accordingly, we agree with the district court's determination that plaintiffs' challenge presents a justiciable case or controversy ripe for judicial resolution.

## III. VALIDITY OF THE COMPTROLLER'S RULING

If "deposits are received, checks paid, or money lent" at CBCT's, then CBCT's are "branches" within the meaning of section 36(f) of the National Bank Act. Hence, the substantive issue in this case is whether all CBCT's exhibit at least one of these indicia of branchness. After a careful review of the record, we agree with the district court's conclusion that the legislative history of the National Bank Act, the plain language of section 36(f), and the Supreme Court's decision in *First National Bank in Plant City v. Dickinson*[31] (hereinafter referred to as *"Plant City"*), requires this court to find that all CBCT's do perform one of these three branch banking services and are, indeed, branch banks.

---

**31.** 396 U.S. 122, 90 S.Ct. 337, 24 L.Ed.2d 312 (1969).

**32.** 20 Op.Atty.Gen. 81 (1911) *construing* Act of 3 June 1864, ch. 106, § 8, 13 Stat. 101 (now codified at 12 U.S.C. § 81).

**33.** 34 Op.Atty.Gen. 1 (1923).

**34.** *First Nat'l Bank v. Missouri ex rel. Barrett*, 263 U.S. 640, 44 S.Ct. 213, 68 L.Ed. 486 (1924).

**35.** *Id.* at 658 n. 1, 44 S.Ct. at 215, 68 L.Ed. at 493.

## A. *Legislative History*

In 1911 the Attorney General rendered an opinion restricting each national bank to *one* "office or banking house located in the place specified in its organization certificate."[32] Notwithstanding this ruling, in an effort to compete with state branch banks, many national banks began to offer routine paying and receiving services at off-premises locations. In 1923 these so-called "tellers' windows" received a limited stamp of approval in the form of a second Attorney General's opinion.[33] However, shortly thereafter, in a case involving a "tellers' window" engaged in more than routine services, the Supreme Court held that national banks had no implied power to branch and were limited by statute to one office or banking house.[34] In this case the Court noted the possible conflict between the two Attorney General's opinions on branching and stated that to the extent of any disagreement it accepted the view of the earlier opinion.[35]

Recognizing the severe handicap this decision placed on national banks in states permitting state bank branching, Congress finally passed the McFadden Act in 1927.[36] The Act authorized national banks to branch within the city limits where they were located, if, under state law, state banks were allowed similarly to branch. This limited authorization was expanded to state-wide, as well as city-wide, branching in 1933.[37] Thus, the Act and its subsequent amendments restored competitive equality to the dual banking system by confining national banks to the branching policies of

---

**36.** Act of 25 Feb. 1927, ch. 191, § 7, 44 Stat. 1224. In 1926 a House report on the McFadden Act described the conditions in the national banking system as "intolerable":

> The present situation is intolerable to the national banking system. The bill [which became the McFadden Act] proposes the only practicable solution . . . by permitting national banks to have branches in those cities where State banks are allowed to have them under State laws.

H.R.Rep.No.83, 69th Cong., 1st Sess. 7 (1926).

**37.** Act of 16 June 1933, ch. 89, § 23, 48 Stat. 189, 190 (now codified at 12 U.S.C. § 36).

the individual states. This also eliminated discrimination between state and national banks in terms of ability to branch while maintaining the preeminence of state authority in the field. Control of the nature and extent of state and national bank branching was left to the states.

■ Several excerpts from the legislative history of the McFadden Act convince us that Congress intended to include virtually all off-premises banking operations—even "tellers' windows" and CBCT's—within the Act's definition of "branch" (now 12 U.S.C. § 36(f)). When first introducing the bill Representative McFadden made the following statement on the floor of Congress:

> Under a ruling issued by ex-Comptroller of the Currency Crissinger, and supported by an opinion from the then Attorney General [34 Op.Atty.Gen. 1 (1923)] national banks in cities where State banks were engaged in branch banking were permitted to establish what has been called "additional offices" or "tellers windows" for the receipt of deposits and cashing checks. The theory of this ruling was based upon the doctrine that a national bank possessed the incidental power to perform this character of service because competition from State banks had created a condition which made it necessary. A limited number of these additional offices have been established, but their status is not legally certain in view of the implications in the decision of the Supreme Court in the St. Louis case [*First City National Bank v. Missouri ex rel. Barrett*, 263 U.S. 640, 44 S.Ct. 213, 68

**38.** 65 Cong.Rec. 11298 (1924) (emphasis added).

**39.** 68 Cong.Rec. 5816 (1927) (emphasis added).

**40.** 66 Cong.Rec. 1628 (1925) (emphasis added). *See also* the comment made by Representative Williams of Michigan:

> Let me suggest to the gentleman that national banks now can meet this competition with State banks by opening tellers' windows; but if this bill goes through, tellers' windows will be wiped out, and national banks would not even have that privilege of meeting the competition of which the gentleman speaks.

L.Ed. 486 (1924)], and they are otherwise not adequate to meet the situation. They were designed to meet what was regarded as a dangerous emergency in the national banking system. *This bill will clear up the uncertainties which may be involved in this situation.*[38]

After the Act's passage, Representative McFadden placed in the Congressional Record a section-by-section analysis of the statute. In this analysis he described the scope of section 36(f)'s definition as follows:

> [Section 36(f)] defines the term "branch." *Any place outside of or away from the main office* where the bank carries on its business of receiving deposits, paying checks, lending money, or *transacting any business carried on at the main office*, is a branch if it is legally established under the provisions of this act.[39]

Similarly, Representative Stevenson of South Carolina gave the following explanation concerning the effect of the Act's definition of "branch":

> [It] take[s] away from the comptroller the right to say that banks can maintain *offices at which they can pay checks and receive deposits.* You take the right absolutely away through that clause [defining "branch"], and we have so written this bill that no power under the Federal Government shall have the right to go into a State and allow any national agency to establish or maintain any branch in violation of the law of the State. . . . [A] State has the right to have its laws respected on great policy matters like this.[40]

66 Cong.Rec. 1768 (1925). Although he did not correctly perceive the net effect of the McFadden Act's definitional section, Representative Williams did understand that "tellers' windows" and the like were meant to be included. The Comptroller also accepts the fact that "Congress intended to define these tellers' windows as branches," but, as for CBCT's, the Comptroller argues that they are "more closely analogous to a mail box or a telephone" than to a tellers' window. 39 Fed.Reg. 44417, 44418 (1974). The fallacies in the Comptroller's mail box-telephone analogy are explored *infra*.

Clearly, Congress intended to include within its definition not only the typical brick-and-mortar branch bank, but also lesser bank agencies which provide only some of the services available at a traditional branch, i. e., agencies which accept deposits, cash checks, lend money, or transact any business generally carried on at the main office.

As noted previously, prior to 1927 the National Bank Act provided that the "usual business" of a national bank "shall be transacted at an office or banking house located in the place specified in its organization certificate." [41] In 1927 the McFadden Act amended this section to allow branching by national banks in accordance with the Act's new approach to branching.[42] Representative McFadden analyzed the effect of this amendment as follows:

> [This section] amends Section 5190 of the Revised Statutes [now 12 U.S.C. § 81] so as to permit the general business of national banking associations to be carried on at the home office and in the branch or branches which the bank may legally establish or maintain in accordance with the provisions of Section 5155 of the Revised Statutes [now 12 U.S.C. § 36] as amended by this act. This section simply legalizes the business of banking that may be carried on in the branch or branches of national banks lawfully established.[43]

Thus, through the McFadden Act amendments Congress made it clear that national bank branches are "lawfully established" only when they conform with the branching regulations of the individual states.

██ Through the breadth of section 36(f)'s definition of "branch", Congress consciously reserved for the states the control and regulation of branching by state and national banks. This is the result of a

carefully worked out legislative compromise giving the federal banking regulatory authorities certain powers and determining that certain powers lie within the domain of state authorities. The Comptroller now invites this federal court to revise the balance of power hammered out by Congress almost fifty years ago. We decline the invitation. Section 36(f)'s definition of "branch" was designed to eliminate a competitive advantage favoring state banks, not to create a new competitive advantage for national banks.

### B. The Concepts of Federalism and Competitive Equality

When Congress established our dual banking system it wisely placed at one cornerstone the principle of competitive equality between state and national banks. In furtherance of this principle, the National Bank Act incorporates certain fundamental aspects of each state's banking regulations into the statute governing the federal banking system. For example, federal law does not preempt state banking law in such vital areas as branching, interest rates, and mergers.[44]

If allowed to stand, the Comptroller's ruling would probably not destroy competitive equality or irreparably injure our dual banking system. At worst, the ruling would only temporarily disturb the competitive balance between state and national banks. If national banks were suddenly allowed to establish CBCT's without regard to state branching regulations, the individual state legislatures would undoubtedly react to protect the interests of their state banking systems by enacting legislation permitting state banks to install and operate off-premises CBCT's. In fact, several

---

**41.** Act of 3 June 1864, ch. 106, § 8, 13 Stat. 101 (now codified at 12 U.S.C. § 81).

**42.** Since the McFadden Act amendment, this section of the National Bank Act has not been changed. Today it provides as follows:
 The general business of each national banking association shall be transacted in the place specified in its organization certificate

and in the branch or branches, if any, established or maintained by it in accordance with the provisions of section 36 of this title.
12 U.S.C. § 81 (1970).

**43.** 68 Cong.Rec. 5816 (1927).

**44.** See 12 U.S.C. §§ 36(c), 85, 214c (1970 & Supp. IV, 1974).

states have already reacted to the Comptroller's ruling in this fashion.[45]

This court must decide whether the National Bank Act gives the Comptroller the power to initiate this technological revolution in banking or whether this initiative falls within the province of the states. Hence, the question we face is more of federalism and statutory interpretation than of sound banking practice or competitive equality. The Comptroller's decision to classify CBCT's as non-branches may be technologically a step in the right direction—that is not for us to decide. Legally, however, we conclude that it was a step beyond the authority vested in him by Congress.

 All parties and the district court agree that the definition of "branch" as it appears in section 36(f) is exclusive, i. e., what constitutes a national bank "branch"

is a threshold question of federal law to be determined without resort to state law.[46] Amicus curiae, the Conference of State Bank Supervisors, disagree with this position, but since their interpretation of section 36(f)'s definition was specifically rejected by the Supreme Court in *Plant City*,[47] we need not reopen that debate. The Comptroller and appellees agree that

> . . . state law cannot affect the definition of terms used in this federal statute, and that a resolution of whether a CBCT is a branch for purposes of federal law should be the same, for example, in California, which permits statewide branch banking, as in Texas, whose constitution prohibits branching.[48]

In sum, "what constitutes a branch of a national bank . . . is to be determined by application of the standards prescribed by 12 U.S.C. § 36(f)." [49]

---

**45.** In the statement accompanying the amendment to his original ruling, the Comptroller states,

> [S]ince the December 1974 ruling, the states of North Dakota, Maryland, Kansas, and Nebraska each have passed statutes authorizing the equivalent of CBCTs to be established and used by state banks and declaring that such terminals are not deemed to be branch banks.

40 Fed.Reg. 21701 (1975). Additionally, in a statement officially adopted by the Oklahoma State Banking Board, the Bank Commissioner of Oklahoma has stated, "[I]f . . . CBCTs are not branches and may lawfully be utilized by national banks, [I] will permit state banks to also use CBCTs." *Oklahoma ex rel. State Banking Bd. v. Utica Nat'l Bank & Trust Co.*, 409 F.Supp. 71, 88 (N.D.Okl., 1975), *notice of appeal filed*, 10th Cir., 23 Feb. 1976.

**46.** Brief for Appellant at 24; Brief for Appellees at 19; *Independent Bankers Ass'n v. Smith*, 402 F.Supp. at 208–09; *accord*, 39 Fed. Reg. 44417–18 (1974).

**47.** In *Plant City* the Supreme Court held as follows:

> We reject the contention made by *amicus curiae* National Association of Supervisors of State Banks to the effect that state law definitions of what constitutes "branch banking" must control the content of the federal definition of § 36(f). Admittedly, state law comes into play in deciding how, where, and when branch banks may be operated, *Walker Bank, supra* for in § 36(c) Congress entrusted to the States the regulation of branching as

Congress then conceived it. But to allow the States to define the content of the term "branch" would make them the sole judges of their own powers. Congress did not intend such an improbable result, as appears from the inclusion in § 36 of a general definition of "branch."

396 U.S. at 133–34, 90 S.Ct. at 343, 24 L.Ed.2d at 319–320 (footnote and citation omitted). The check which a federal definition of "branch" places on state power was also explained by retired Justice Clark, sitting by designation in the Eighth Circuit:

> [F]ederal law does not incorporate every restriction and limitation that a state sees fit to impose on banks chartered under its own authority, and for this reason the threshold question of whether a proposed enlargement of a national bank is a "branch" is a question of federal law to be determined initially by the Comptroller and [to be] reviewed by the federal courts.

*Driscoll v. Northwestern Nat'l Bank*, 484 F.2d 173, 175 (1973). In other words, a state will not be allowed to define *all* banking activities as "branching," and thereby completely usurp federal regulation of national banks.

**48.** 39 Fed.Reg. 44418 (1974).

**49.** *North Davis Bank v. First Nat'l Bank*, 457 F.2d 820, 822 (10th Cir. 1972) (footnote omitted). *Accord, First Nat'l Bank v. Dickinson (Plant City)*, 396 U.S. at 133–34, 90 S.Ct. at 343, 24 L.Ed.2d at 319–320; *Ramapo Bank v. Camp*, 425 F.2d 333, 346 (3d Cir.), *cert. denied*, 400 U.S. 828, 91 S.Ct. 57, 27 L.Ed.2d 58 (1970).

In the statement accompanying his ruling, the Comptroller correctly cites *Plant City* as supporting the exclusivity of the federal definition of "branch." He misapprehends, however, the remainder of Chief Justice Burger's reasoning and analysis when he states,

> Consideration . . . of the competitive aspects referred to by the Court in *Plant City* does not require CBCT's to be viewed as branches. Additionally, an analysis of the contractual rights and liabilities under which a CBCT is operated shows that—even if a CBCT is considered to be a branch office, branch agency, or branch place of business—it is not receiving deposits, paying checks, or making loans within the meaning of 12 U.S.C. 36(f). . . . The[se] contractual rights and liabilities arise from the usual operating procedures of a CBCT, and have significant purposes other than structuring the technical and legal aspects of the transaction to avoid the branch banking statutes. Compare *Plant City, supra* 396 U.S. at 126, 136–137 [90 S.Ct. at 344–345, 24 L.Ed.2d at 321–322].[50]

To the contrary, *Plant City* clearly supports (in fact, requires) the district court's conclusion that all CBCT's are branches for purposes of federal law.

During the 1960's the Supreme Court twice focused its attention on the subject of branching. In the first of these cases, *First National Bank v. Walker Bank & Trust Co.*,[51] Justice Clark reviewed the legislative history of section 36(c) and then gave judicial approval to the concept of competitive equality:

> It appears clear from this resume of the legislative history of § 36(c)(1) and (2) that Congress intended to place national and state banks on a basis of "competitive equality" insofar as branch banking was concerned.[52]

*Walker Bank* involved the question of how much state law was incorporated into the federal system via section 36(c). The Comptroller argued that since Utah's banking statute expressly authorized state banks to have branches, national banks could branch freely without regard to another state statutory provision restricting the method of branching. Justice Clark, writing for a unanimous Court, rejected this argument and held that "national branch banking is limited to those States the laws of which permit it, and even then 'only to the extent that the State laws permit branch banking.' "[53]

In *Plant City*, the second important branching decision of the Sixties, the Court again recognized that "Congress has deliberately settled upon a policy intended to foster 'competitive equality.' "[54] A national bank in Plant City, Florida, had received permission from the Comptroller to provide armored car services to customers in its service area. The armored car delivered cash and received funds for deposit on a

**50.** 39 Fed.Reg. 44419 (1974).

**51.** 385 U.S. 252, 87 S.Ct. 492, 17 L.Ed.2d 343 (1966).

**52.** *Id.* 385 U.S. at 261, 87 S.Ct. at 497, 17 L.Ed.2d at 349. Earlier when the McFadden Act became law, Representative McFadden also used the phrase "competitive equality" to describe the Act's purpose:

> As a result of the passage of this act, the national bank act has been so amended that national banks are able to meet the needs of modern industry and commerce and competitive equality has been established . . . .

68 Cong.Rec. 5815 (1927).

**53.** 385 U.S. at 261, 87 S.Ct. at 497, 17 L.Ed.2d at 349. Earlier in the opinion, while reviewing legislative history, Justice Clark observed:

> The intent of the Congress to leave the question of the desirability of branch banking up to the States is indicated by the fact that the Senate struck from the House bill the time limitation, thus permitting a subsequent change in state law to have a corresponding effect on the authority of national banks to engage in branching. The Senate Report concluded that the Act would permit "national banks to have branches in those cities where State banks are allowed to have them under State laws."

*Id.* at 258, 87 S.Ct. at 496, 17 L.Ed.2d at 347, *quoting from* S.Rep.No.473, 69th Cong., 1st Sess. 14 (1926).

**54.** 396 U.S. at 131, 90 S.Ct. at 342, 24 L.Ed.2d at 318, *citing First Nat'l Bank v. Walker Bank & Trust Co.*, 385 U.S. at 261, 87 S.Ct. at 497, 17 L.Ed.2d at 349.

daily basis. The bank also established, with the Comptroller's approval, an off-premises depository for its retail and commercial customers. This stationary receptacle, located in a shopping center near the bank, was served each day by the armored car without charge to the depositors. Shortly after commencing these off-premises operations, the Plant City bank was notified by the Florida Banking Commissioner that these activities violated a provision of Florida law restricting the business of banking to the main banking house. The bank responded by seeking a declaratory judgment that its activities did not constitute branch banking, and, therefore, were not affected by this provision of Florida law. The district court ruled in the bank's favor,[55] but the Fifth Circuit reversed, holding that to preserve competitive equality the Comptroller must defer to Florida's concept of branch banking.[56] The Supreme Court granted certiorari, and while emphasizing the exclusivity of section 36(f)'s definition,[57] affirmed the Fifth Circuit's decision. Chief Justice Burger concluded his *Plant City* opinion with the following admonition:

> Here we are confronted by a systematic attempt to secure for national banks branching privileges which Florida denies to competing state banks. The utility of

the armored car service and deposit receptacle are obvious; many States permit state chartered banks to use this eminently sensible mode of operations, but Florida's policy is not open to judicial review any more than is the congressional policy of "competitive equality." Nor is the congressional policy of competitive equality with its deference to state standards open to modification by the Comptroller of the Currency.[58]

■ The same admonition applies with equal force to the facts of the instant case: Again we are confronted with an attempt to secure for national banks branching privileges which many states deny to competing state banks. The utility of CBCT's is obvious; several states permit state-chartered banks to use this eminently sensible mode of operations, but the policy of those states who choose to prohibit CBCT's is not open to judicial review or to modification by the Comptroller. The policy of competitive equality defers to state standards, not to standards prescribed by the Comptroller. Since 1927 Congress has made it clear that the Comptroller lacks the authority "to allow a national bank to establish as many agencies for receiving deposits and paying checks as he [the Comptroller] sees fit . . . ."[59]

**55.** 274 F.Supp. 449 (N.D.Fla.1967).

**56.** *Dickinson v. First Nat'l Bank*, 400 F.2d 548, 557 (5th Cir. 1968).

**57.** At the outset of his opinion Chief Justice Burger notes,

[W]hile Congress has absolute authority over national banks, the federal statute has incorporated by reference the limitations which state law places on branch banking activities by state banks. . . . State law has been utilized by Congress to provide certain guidelines to implement its legislative policy.

396 U.S. at 131, 90 S.Ct. at 342, 24 L.Ed.2d at 318. He then, however, cautions that the Fifth Circuit

perhaps overstated the relation of state law to the problem, since the threshold question [of what constitutes a "branch"] is to be determined as a matter of federal law, having in mind the congressional intent that so far as branch banking is concerned "the two ideas [*i. e.*, unit banking and branch banking] shall compete on equal terms and only where

the States make the competition possible by [letting] their own institutions . . . have branches."

*Id.* at 134, 90 S.Ct. at 343, 24 L.Ed.2d at 320, *quoting from* 77 Cong.Reg. 5896 (1933).

**58.** *Id.* 396 U.S. at 138, 90 S.Ct. at 345, 24 L.Ed.2d at 322 (footnote omitted).

**59.** 66 Cong.Rec. 1627 (1925). During the House debates over the McFadden Act, Representative Stevenson of South Carolina explained:

[Y]ou have branches in the Federal reserve system established by the dictum of the Comptroller of the Currency, who has assumed [*sic*] to say that he can allow a national bank to establish as many agencies for receiving deposits and paying checks as he sees fit. . . . I will show presently that we cut that out, root and branch.

*Id.*

We note that federally-chartered savings and loan associations and federally-chartered credit unions are presently permitted to establish and operate CBCT's (referred to as remote service

As developed by the Supreme Court in *Walker Bank* and *Plant City*, the policy of competitive equality "reflects the congressional concern that neither [the state bank system nor the national bank] system have advantages over the other in the use of branch banking."[60] Undeniably, the Comptroller's ruling in the instant case would give national banks at least a temporary advantage over competing state banks in those jurisdictions which presently do not permit state-chartered banks to establish off-premises CBCT's. The magnitude of this advantage would be determined by the haste with which state legislatures acted to amend the state statutes that now restrict the use of electronic fund transfer systems.

■ If a state has historically chosen not to allow branch banking because of a general fear of "bigness" and large concentrations of power, there is every evidence that Congress and the Supreme Court re-

gard this decision as the state's prerogative. A state which generally opposes "big banks" may foresee developments along this line: First, the larger banks will be able to afford more CBCT's than their smaller competitors. Then, the added convenience of these extra CBCT's will attract old and new customers away from the smaller banks. The end result will be fewer banks, more "big" banks, and less competition in the financial sector. Hence, a state that favors vigorous competition by many small banks may nevertheless be forced to submit to less competition and larger banks in order to maintain a viable state banking system.[61] This frustration of state policy was not the intent of Congress in the National Bank Act nor the intent of the Supreme Court in *Walker Bank* and *Plant City*. Properly construed, the National Bank Act and the policy of competitive equality leave to the states the question of branching and its inherent advantages and disadvantages.[62]

units or RSU's) without regard to state or federal branching restrictions under regulations promulgated by the Federal Home Loan Bank Board and the National Credit Union Administration, respectively. 12 C.F.R. § 545.4–2 (1975) (savings and loan associations), *amended by* 40 Fed.Reg. 27477 (30 June 1975) (extends termination date to 31 July 1976); 12 C.F.R. § 721.3 (1975) (credit unions). Both of these regulations are of a temporary, experimental nature. These "pilot projects" are possible because Congress has not defined "branching" in the area of federal savings and loan associations and federal credit unions, but has left it to the discretion of the governing agencies to regulate what constitutes a "branch." In contrast, section 36(f) of the National Bank Act did not leave it to the Comptroller to determine by regulation what constitutes a "branch" of a national bank. If the Federal Home Loan Bank Board and the National Credit Union Administration decide to authorize RSU's on a permanent basis, each state (not the Comptroller) will have to decide whether the resulting competitive advantage for savings and loan associations and credit unions necessitates a change in that state's posture toward bank-operated CBCT's.

**60.** *First Nat'l Bank v. Dickinson (Plant City),* 396 U.S. at 131, 90 S.Ct. at 342, 24 L.Ed.2d at 318; *accord, First Nat'l Bank v. Walker Bank & Trust Co.,* 385 U.S. at 261, 87 S.Ct. at 497, 17 L.Ed.2d at 349.

**61.** On the other hand, a state that opposes "big banks" could conclude that "[b]ecause of econ-

omies in operation [and because POS terminals are relatively inexpensive], small banks may [very] well be the greatest beneficiaries of EFTS and CBCTs." Findings of Fact No. 57 in *Oklahoma ex rel. State Banking Bd. v. Utica National Bank and Trust Co.,* 409 F.Supp. 71, 88 (N.D.Okl., 1975). In either case, the state, not the Comptroller, must make this policy determination.

**62.** Relevant caselaw on this question is rapidly developing. Since *Plant City* federal courts have on several occasions reaffirmed the preeminence of state law in the field of branch banking. In *First Nat'l Bank v. Camp,* 151 U.S.App.D.C. 1, 465 F.2d 586 (1972), this court held that in considering a branch application the Comptroller was not bound by an opinion of a state administrative officer interpreting state law. Nevertheless, the court was quick to emphasize that the Comptroller *was* bound by the statute law of the state. As Judge MacKinnon explained,

State opinions interpreting their branching laws are to be considered by the Comptroller, but whether they are to be followed depends upon their conformance with the "statute law of the state in question." The Comptroller's obligation is to weigh each branch application against the standard imposed by the statute law of the state, and to deny the application if that standard is not met.

*Id.* at 12, 465 F.2d at 597 (footnote omitted). Judge MacKinnon also ventured the following explanation of how the policy of competitive

equality works to resolve conflicts between state and federal supervision of branch banking:

The doctrine of "competitive equality" results from this country's unique "dual banking system," under which wholly independent state and national chartering authority have grown up together. In cases where conflicts of state and federal supervision arise, as here, we must pay close attention to the congressional design for resolving that specific conflict. In the context of branch banking the "competitive equality" mandated by the statute focuses on the competition for expansion opportunities within each state between individual national- and state-chartered banks. The congressional policy adopted places the competing banks on an equal footing—hence "competitive equality"—by requiring that national banks are to be subject to the same statutory restrictions on branch establishment as are the state banks in each state. Any ambiguity as to the totality of this national deference to state law was resolved in Walker Bank . . . .

*Id.* 151 U.S.App.D.C. at 7, 465 F.2d at 592 (footnotes and citations omitted).

In *Driscoll v. Northwestern Nat'l Bank,* 484 F.2d 173 (8th Cir. 1973), the Eighth Circuit held that the Comptroller was obligated to make a fresh determination as to whether a group of walk-up television tellers constituted a "branch" bank as a matter of federal law. Six years prior to installation, the Comptroller had issued an informal opinion stating that the TV tellers would not constitute a "branch", but after this determination the state law governing branches had been changed and various discrepancies in the record had emerged. The Eighth Circuit, speaking through Supreme Court Justice Clark (the author of *Walker Bank,* sitting by designation) held,

The Comptroller's action here is . . . quite disturbing. A Minnesota state bank under 1971 state law concededly cannot enjoy the three facilities which Northwestern claims here but must be content with one detached facility. Since the success of the competitive equality doctrine depends to a significant degree on the Comptroller's determination of whether in a given case a proposed facility constitutes a "branch," the courts must carefully examine the sufficiency of the factual considerations on which the Comptroller's decision is based.

*Id.* at 175. After carefully examining these factual considerations, the court decided to reverse the district court's judgment in favor of the national bank and to remand the case to the Comptroller for further consideration.

Several federal district courts, other than the District of Columbia, have had to decide whether CBCT's of various shapes, forms, and sizes are "branches" within section 36(f)'s definition. While all of these decisions attempt to apply the policy of competitive equality, they do not in every case reach the same result.

In *Independent Bankers v. Camp,* 357 F.Supp. 1352 (D.Or.1973), Judge Skopil of the District of Oregon held that in the absence of a specific state statute authorizing state banks to install and operate CBCT's, section 36(c) of the National Bank Act prohibits the establishment of CBCT's by national banks. In this opinion, the court did not expressly decide that CBCT's are "branches" under section 36(f), but in order to invoke section 36(c) and the absence of specific state authorization, the court necessarily made the threshold determination that CBCT's constitute "branches" as a matter of federal law. Since the national bank seeking to install the CBCT's in question had previously sought the Comptroller's approval through normal branch application procedures, perhaps Judge Skopil took this as a concession that the CBCT's were, in fact, "branches." In any event, it is our view that both the bank and the court were correct in assuming that CBCT's are "branches" under federal law. In addition, Judge Skopil correctly perceived the mandate of section 36 and the proper role of the federal judiciary in this area when he declared, "Whether or not this technological innovation [CBCT's] should be encouraged is a question for the state legislature to consider, not this Court." 357 F.Supp. at 1356-57.

Observing that CBCT's exhibit some of the indicia of "branchness", two federal district courts have found violations of section 36(c) only to the extent that the CBCT's in question performed some, but not all, of the three branch banking services listed in section 36(f). Each court, however, drew a different line between branch and non-branch functions.

In the first of these decisions, *Colorado ex rel. State Bank Bd. v. First Nat'l Bank,* 394 F.Supp. 979 (D.Colo.1975), *appeals docketed,* Nos. 75-1523, 75-1611, 75-1612, 10th Cir., 17 July 1975, the State Bank Commissioner sued to enjoin the operation of an off-premises CBCT by a national bank in Fort Collins, Colorado, and to prevent the Comptroller from approving similar facilities in the state. Following the policy of competitive equality and applying Colorado law, which allows only one detached banking facility, Judge Matsch held that the Fort Collins facility was a "branch" within the meaning of section 36(f) because its received deposits, but not because it paid checks or lent money. Accordingly, the court declared the Comptroller's ruling (the same ruling involved in the instant case) invalid to the extent that it authorized the receipt of deposits by off-premises CBCT's. In addition, the court held that receiving deposits at the Fort Collins facility violated section 36 since it did not comply with the detached facility restrictions of Colorado law.

The Northern District of Illinois produced the second decision reaching a middle-of-the-road result on the issue of CBCT "branchness". In *Illinois ex rel. Lignoul v. Continental Illinois*

## C. *The Federal Definition of "Branch"*

The Supreme Court in *Plant City* construed section 36(f)'s definition as follows:

Although the definition may not be a model of precision, in part due to its circular aspect, it defines the minimum content of the term "branch"; by use of the word "include" the definition suggests a calculated indefiniteness with respect to the outer limits of the term. However, the term "branch bank" at the very least includes *any* place for receiving deposits or paying checks or lending money apart from the chartered premises; it may include more. It should be emphasized that since § 36(f) is phrased in the disjunctive, the offering of any one of the three services mentioned in that definition will provide the basis for finding that "branch" banking is taking place. Thus not only the taking of deposits but also the paying of checks or the lending of money could equally well provide the basis for such a finding.[63]

Since the federal definition of "branch" includes "at the very least" *any* place where deposits are received, checks paid, or money lent (and maybe some other places as well), we will consider seriatim these three separate branch banking functions.

The appendix to the Comptroller's ruling draws several rather fine distinctions between banking transactions executed at a CBCT and similar activities conducted at a bank's main office or a traditional branch. In essence, the Comptroller argues that "[c]ommunications between customers and their banks through CBCT's involve instructions to consummate . . . transactions"[64] and not "transactions" themselves. This is so, we are told, because CBCT's are not yet sophisticated enough to carry out certain procedures, *e. g.*, to verify the authenticity of the documents they receive. Thus, the consummation of a CBCT transaction and the attachment of contractual rights and obligations must await the main bank's verification and approval. Additionally, as to manned, point-of-sale CBCT's, the Comptroller insists that "the customer's direct transactions are not with the bank at all, but with a bona fide third party."[65] According to the Comptroller and one federal district court in Oklahoma,[66] these carefully drawn distinctions prove that deposits can be received, checks can be paid, and loans can be made only by the main bank, not by CBCT's. We disagree on all three counts.

### 1. *Deposits Received*

Concededly, in his appendix the Comptroller focuses upon several differences in the deposit-receiving functions of a CBCT

*Nat'l Bank & Trust Co.*, 409 F.Supp. 1167 (N.D. Ill. 1975), *appeals docketed*, Nos. 76–1083 to 76–1086, 7th Cir., 27 Jan. 1976, Judge Will decided that "the functions performed by CBCTs, both unmanned and manned, constitute making a deposit or lending money within the meaning of 12 U.S.C. § 36(f) . . . [but that] cash withdrawals as presently effectuated by CBCTs do not constitute cashing checks." *Id.* at 1181.

Two other district courts, while declining to take a middle-of-the-road approach, have come up with conflicting answers on the question whether CBCT's are branches. On 14 November 1975 Judge Meredith of the Eastern District of Missouri ruled that two off-premises CBCT's operated by a national bank in St. Louis were branch banks and, therefore, violated section 36 of the National Bank Act and the Missouri banking statute. *Missouri ex rel. Kostman v. First Nat'l Bank*, 405 F.Supp. 733 (E.D.Mo. 1975), *appeal docketed*, No. 76–1056, 8th Cir., 21 Jan. 1976. Accordingly, he ordered the defendant bank to cease operating these termi-

nals and to refrain from installing similar ones. Five weeks later, Chief Judge Barrow of the Northern District of Oklahoma found that three CBCT's in Tulsa were not branches and that the use of these facilities did not constitute branch banking under the McFadden Act or the anti-branching statutes of Oklahoma. *Oklahoma ex rel. State Banking Bd. v. Utica Nat'l Bank & Trust Co.*, 409 F.Supp. 71 (N.D.Okl., 1975), *notice of appeal filed*, 10th Cir., 23 Feb. 1975.

63. 396 U.S. at 135, 90 S.Ct. at 344, 24 L.Ed.2d at 320 (emphasis in original).

64. 39 Fed.Reg. 44421 (1974).

65. 12 C.F.R. § 7.7491 (1975). *See* note 5 *supra* for a description of point-of-sale CBCT's.

66. *Oklahoma ex rel. State Banking Bd. v. Utica Nat'l Bank & Trust Co.*, 409 F.Supp. 71 (N.D. Okl., 1975), *notice of appeal filed*, 23 Feb. 1976.

and a typical branch.[67] Yet these are differences in form, not differences in substance or result. In fact, the Comptroller's arguments (and those adopted in the Oklahoma case) [68] are precisely the arguments rejected by the Supreme Court in *Plant City*.[69] The national bank there contended that its armored car and shopping center depository did not "receive deposits" within the meaning of section 36(f) since (1) bank customers could arrange for the armored car to pick up funds for deposit, or deliver cash in exchange for checks, only after signing an agency contract with the armored car service and the bank, and (2) all deposits were accompanied by deposit slips containing a contract which provided that the bank and the armored car were the

---

**67.** Depending on the characteristics of a particular CBCT, the Comptroller offers the following considerations which he considers dispositive of the deposit-receiving issue:

(1) *Unmanned and off-line:*

When an unmanned automated terminal is operated off-line, *i. e.,* not connected by wire to the bank's computer, a deposit transaction is not consummated until the bank actually is notified of the customer's instructions, and the amount of funds necessary to implement the instruction are received and verified. This notification, receipt, and verification takes place at the bank after collection from the CBCT of the funds left there and of a tape or other medium upon which all instructions have been recorded. The bank cannot give credit for these funds prior to receipt and verification any more than it could give credit for items sent by mail to the bank and not yet received. These funds do not become deposits for any purpose—including the application of 12 U.S.C. 36(f)—until received and accepted at the chartered banking premises.

12 C.F.R. § 7.7491 (1975).

(2) *Unmanned and on-line:*

Funds left at an unmanned CBCT which is connected by wire to the bank's computer and operated on-line similarly do not become deposits until received and verified at the bank. The customer's instructions to receive the deposit are instantaneously communicated to the bank, just as if the customer had called the bank by telephone to request that the bank receive funds for his account. No unmanned CBCT now in use, however, is able to verify the funds received, and it would be unsafe and unsound practice for the bank to give immediate unconditional credit to a customer based solely upon information supplied by the customer without verification. Thus the customer's offer to create a deposit relationship is not accepted, and the contractual debtor-creditor deposit relationship does not arise, until the funds are received, counted, and accepted at the bank.

*Id.*

(3) *Manned and on-line:*

As with on-line unmanned CBCT's, all transactions are verified instantaneously at the bank and, insofar as the bank is concerned, consummated at the bank. The rea-

soning stated above for unmanned CBCT's is equally applicable here. Additionally, the bank customer is dealing directly not with the bank, but with a third party. . . .

*Id.* From the arguments made by the Comptroller in the appendix to his ruling, it appears that all manned CBCT's are also on-line units. If they are not, it would be even more difficult to draw a colorable distinction between the deposits received at a manned, off-line CBCT and those received at a traditional branch or a stationary depository like the one in *Plant City.*

**68.** In the Oklahoma case, the court concluded:

With respect to the making of deposits, within the banking industry a deposit is not "received" until the items tendered for deposit have been actually counted or verified, credited to the account of the depositor, and thus available to the bank for its use as well as available to the customer for withdrawal. *Oklahoma ex rel. State Banking Bd. v. Utica Nat'l Bank & Trust Co.,* 409 F.Supp. 71, 91 (N.D.Okl., 1975), Conclusion of Law No. 9(b)(i). *Accord,* Findings of Fact Nos. 7, 26–28 at 79, 82–83.

**69.** In *Plant City* the Supreme Court described the bank's position as follows:

. . . The bank urges that, "deposit" being a word of art, the determination of when a deposit is made is not a casual one inasmuch as that determination fixes important legal relationships of the parties.

The bank also urges that creation of a deposit being purely a matter of intent, the issue is governed exclusively by the private contract. Since these contracts must be interpreted under state law, the argument runs, no "deposit" is actually received as such until monies delivered to the *armored car or the receptacle* are physically delivered into the hands of a bank teller at the chartered premises. Until such time the bank may not, under the contracts, be held to account for the customer's funds.

396 U.S. at 135–36, 90 S.Ct. at 344, 24 L.Ed.2d at 321 (emphasis added). In the above quotation, substituting "CBCT" for the italicized words "armored car or the receptacle" results in an argument which is difficult to distinguish from the Comptroller's position in the instant case.

agents of the customer and that the transmittal of funds was not deemed to be a "deposit" until delivered into the bank's hands.

The Supreme Court emphatically rejected the contention of the bank and the Comptroller that because of these contractual relationships, the challenged facilities did not constitute "branches" under section 36(f):

> Because the purpose of the statute is to maintain competitive equality, it is relevant in construing "branch" to consider, not merely the contractual rights and liabilities created by the transaction, but all those aspects of the transaction that might give the bank an advantage in its competition for customers. *Unquestionably, a competitive advantage accrues to a bank that provides the service of receiving money for deposit at a place away from its main office; the convenience to the customer is unrelated to whether the relationship of debtor and creditor is established at the moment of receipt or somewhat later.*
>
> . . . Here, penetrating the form of the contracts to the underlying substance of the transaction, we are satisfied that at the time a customer delivers a sum of money either to the armored truck or the stationary receptacle, the bank has, for all purposes contemplated by Congress in § 36(f), received a deposit. The money is given and received for deposit even though the parties have agreed

that its technical status as a "deposit" which may be drawn on is to remain inchoate for the brief period of time it is in transit to the chartered bank premises. The intended deposits are delivered and received as part of a large-scale continuing mode of conducting the banking business designed to bring basic bank services to the customers.

> Since the putative deposits are in fact "received" by a bank facility apart from its chartered place of business, we are compelled, in construing § 36(f), to view the place of delivery of the customer's cash and checks accompanied by a deposit slip as an "additional office, or . . . branch place of business . . . at which deposits are received." [70]

We conclude that this excerpt from *Plant City* decides the instant case insofar as deposits are concerned: [71] "Unquestionably, a competitive advantage accrues to a bank that provides the service of receiving money for deposit at a place away from its main office", i. e., at an off-premises CBCT. "Penetrating the form of [a CBCT deposit transaction] to the underlying substance of the transaction, we are satisfied that at the time a customer delivers a sum of money [to a CBCT], the bank has, for all purposes contemplated by Congress in § 36(f), received a deposit."

■ Besides the ordinary deposit into a customer's checking or savings account, two other types of CBCT transactions properly are characterized as "deposits" within the

**70.** 396 U.S. at 137, 90 S.Ct. at 345 (footnote omitted).

**71.** Even Judge Matsch, who read *Plant City* very narrowly in the Fort Collins, Colorado, case, nevertheless felt "compelled to conclude" that there was "no functional difference between the way in which a customer makes a deposit in [an unmanned, off-line CBCT] and the stationary receptacle for deposits which was the subject of the decision in [*Plant City*]." *Colorado ex rel. State Banking Bd. v. First Nat'l Bank,* 394 F.Supp. at 984; *accord, Illinois ex rel. Lignoul v. Continental Ill. Nat'l Bank & Trust Co.,* 409 F.Supp. 1167, 1176 (N.D. Ill. 1975). In *Continental Illinois* Judge Will also exposes the illogic of the Comptroller's position on deposits:

> The logical extension of [the] argument would require a finding that deposits received at an off-premises building occupied by bank personnel who took them and wired the information regarding them to the main office's computer, were made at the main office if, pursuant to contract, funds were not finally credited to the customer's account until the main office received and verified the deposit. In consequence, a manned physically remote branch would not constitute a branch under Section 36(f). Under *Plant City* and, in fact, deposits entered at CBCT's are made at the terminal rather than at the bank and the CBCT is, accordingly a branch. *Id.*

meaning of section 36(f): (1) transfers of funds between two accounts of the same customer and (2) payments on installment loans or credit card accounts.

In the first of these transactions, CBCT's enable bank customers to transfer funds between two of their accounts at a place remote from the bank's main premises. Hence, under the rationale of *Plant City,* these off-premises CBCT's are bank facilities where deposits are received when customers withdraw money from their checking, savings, or credit card accounts and deposit these funds into one of their other accounts. The Comptroller's attempt to analogize these account transfers to banking-by-mail and banking-by-telephone breaks down because, in the case of a mailbox or a telephone, no place or facility established (*i. e.,* owned or rented) by a bank is involved.[72] Mailboxes and telephones are not facilities supplied by banks for the added convenience of their customers and designed to retain and attract patronage.

Similarly, we conclude that banks which provide the service of receiving payments on installment loans or credit card accounts at a place away from their main banking premises are receiving deposits within the meaning of section 36(f).[73] The competitive advantage accruing to a bank that accepts conventional deposits at various conveniently located CBCT's is difficult to distinguish

from the advantage that accrues to a bank from permitting its customers to deposit their monthly credit card or installment loan payments in the same CBCT's. Again, the bank is providing a customer convenience and is thereby gaining a competitive advantage over banks that do not furnish this service.

In *Plant City* the Court commented,

> We are satisfied . . . that the contracts have no significant purpose other than to remove the possibility that the monies received will become "deposits" in the technical and legal sense until actually delivered to the chartered premises of the bank.[74]

By isolating this statement from the rest of the Court's reasoning and analysis, the Comptroller attempts to distinguish CBCT's from the armored car and receptacle involved in *Plant City.* He argues that the legal structure of a CBCT transaction is not tailored to evade the branch banking laws, but arises from the usual operating procedures of a CBCT. Be this as it may, the *Plant City* Court expressly states that any impact on competitive equality is unrelated to when the debtor-creditor relationship technically arises,[75] and that private contractual relationships do not define the outer limits of section 36(f):

> [W]hile the contracting parties are free to arrange their private rights and liabilities as they see fit, it does not follow that

---

**72.** In the language of the *Plant City* Court, a CBCT is undeniably both "*a place* away from [the bank's] main office" and "*a bank facility* apart from [the bank's] chartered place of business." 396 U.S. at 137, 90 S.Ct. at 345, 24 L.Ed.2d at 322 (emphasis added).

**73.** In the Chicago, Illinois, CBCT case the court reached the same result we do insofar as transfers between the accounts of the same customer are concerned. However, the court concluded that payments on outstanding loan and credit card obligations "do not constitute deposits inasmuch as they are . . . not the deposit of funds in an account which is subject to future withdrawals by the customer." *Illinois ex rel. Lignoul v. Continental Ill. Nat'l Bank & Trust Co.,* 409 F.Supp. 1167, 1177 (N.D. Ill.1975). This narrow construction of the deposit-receiving function is not consistent with the Supreme Court's expansive interpretation

of the term "branch" in *Plant City.* There the Court holds that the three branch banking services found in section 36(f) define only "the *minimum* content of the term 'branch'." 396 U.S. at 135, 90 S.Ct. at 344, 24 L.Ed.2d at 320. Also, the Court describes "a calculated indefiniteness with respect to the outer limits of the term [branch]." *Id.* We conclude that this calculated indefiniteness leaves sufficient leeway for the inclusion of activities such as the receipt of loan and credit card payments, which closely resemble, in competitive effect, the other three services expressly mentioned in section 36(f).

**74.** 396 U.S. at 136, 90 S.Ct. at 344, 24 L.Ed.2d at 321.

**75.** *Id.* at 137, 90 S.Ct. at 345, 24 L.Ed.2d at 322.

private contractual arrangements, binding on the parties under state law, determine the meaning of the language or the reach of § 36(f).[76]

Furthermore, the Court explains that it is not the intent of the parties, but their conduct and the nature of their relations that will determine whether or not they are engaged in branch banking.[77] As a matter of federal law, the pivotal issue is whether CBCT operations constitute branch banking—not whether the banks and their customers intend to engage in branch banking. From the bank's standpoint, from the customer's standpoint, and from the standpoint of a competing bank, we can discern no significant difference between a CBCT deposit transaction and the deposits made at the *Plant City* receptacle—"the conduct of the parties and the nature of their relations" are functionally equivalent.

### 2. Checks Paid

Here, for the purposes of argument, the Comptroller divides CBCT's into two classifications, manned and unmanned terminals. The Comptroller then lists three reasons why a cash withdrawal from the latter classification of CBCT's does not constitute paying a check:

First, if the withdrawal is from a savings account, no check can be involved because savings deposits by definition are not subject to withdrawals by check. Second, whatever the nature of the deposit account, the CBCT is activated by a card or similar device and no check is involved. The required form of a check is specified in section 3–104 of the Uniform Commercial Code. Nothing resembling a check is used in withdrawals using an unmanned

CBCT. Third, all withdrawals are subject to verification. If the CBCT is online, the verification takes place instantaneously at the bank. . . . If the CBCT is offline, the transaction is verified at the bank when the tape or other record is retrieved from the CBCT.[78]

In the case of manned units, the Comptroller does not rely on the second argument above since manned CBCT's do cash conventional paper checks. Instead, he repeats his contention that "the customer's direct transactions are not with the bank at all, but with a bona fide third party."[79]

To determine what constitutes paying a "check" under section 36(f) this court must balance the technical commercial definition of a "check" against the method of statutory interpretation prescribed by the Supreme Court in *Plant City*. The Uniform Commercial Code defines a "check" as a "negotiable instrument" (*i. e.*, a "draft") "drawn on a bank and payable on demand."[80] Admittedly, it would be difficult to fit under the UCC definition, or the standard dictionary definition, of "check" anything involved in an unmanned CBCT withdrawal transaction. Fortunately, such semantical exercises have become unnecessary since the *Plant City* Court instructed that "the definition of 'branch' in § 36(f), must not be given a restrictive meaning which [would] frustrate the congressional intent . . . found to be plain in *Walker Bank*."[81] The Court, as we saw earlier, went on to note that Congress intended "a calculated indefiniteness with respect to the outer limits of the term ['branch']," and that Section 36(f) only describes "the minimum content of the term . . . ., it may include more."[82]

---

76. *Id.* at 136, 90 S.Ct. at 344, 24 L.Ed.2d at 321.

77. Specifically, the Court explains,
We need not characterize the contracts as a sham or subterfuge in order to conclude that the conduct of the parties and the nature of their relations bring First National's challenged activities within the federal definition of branch banking.
*Id.* at 137, 90 S.Ct. at 345, 24 L.Ed.2d at 322. Likewise, we need not find that the legal structure of a CBCT transaction is tailored to evade federal or state branching laws.

78. 12 C.F.R. § 7.7491 (1975).

79. *Id.*

80. Uniform Commercial Code § 3–104(2) (1972 version).

81. 396 U.S. at 134, 90 S.Ct. at 343, 24 L.Ed.2d at 320.

82. *Id.* at 135, 90 S.Ct. at 344, 24 L.Ed.2d at 320.

The Comptroller's contention that this expansive language is not applicable to the check cashing, account transfer, or lending functions of a CBCT is totally without merit. Although "*Plant City* did not decide whether the facilities there were branches at which 'checks [are] paid, or money lent,' " [83] the Court, in holding that the facilities were "branches" at which deposits are received, relied on a broad interpretive standard applicable to *all* future determinations of "branchness." The legislative history of the McFadden Act and the Supreme Court's decision both indicate that Congress intended to include under section 36(f) at least the routine and traditional bank services normally provided at the bank's main office, *i. e.,* the simple functions of (1) receiving funds (receiving deposits into customers' accounts and receiving loan and credit card payments) and (2) disbursing funds (paying checks and lending money). This broad federal definition of branch serves two important purposes. It insures state preeminence in the field of branch banking, and it affords the flexibility necessary to adapt a 1927 statute to the technological innovations of the computerized Seventies.

■ In previously mentioned cases involving CBCT's in Fort Collins, Colorado; Tulsa, Oklahoma; and Chicago, Illinois; [84] three district courts, in our view, failed—at least on the issue of check cashing—to heed the Supreme Court's admonition not to give section 36(f) a restrictive interpretation that would frustrate congressional intent. Each court decided that checks were not paid through the use of a CBCT. Relying on definitions found in Webster's Dictionary and the UCC, the Colorado court refused to rule that dispensing cash at an unmanned CBCT constituted check cashing, because the bank's customers communicated with the bank through the vehicle of a plastic card rather than a negotiable check. According to the court,

> There is an obvious similarity between the customer's use of this machine to obtain a packet of $25.00 with a corresponding debit to his checking account balance and the drawing of a check payable to cash or to himself with the presentation of that check for payment by the drawee bank at a teller station. This sameness in result, however, is not controlling. What is different in the transaction is the means by which the customer communicates with the bank.[85]

We respectfully suggest that the Colorado court is exhalting form over substance—exactly what the Supreme Court instructed us not to do.[86] The excerpt above clearly indicates where the district court deviated from the flexible interpretive standard prescribed in *Plant City.* Recognizing that from the standpoint of the bank customer—and thus from the standpoint of competitive effect—there is no meaningful difference between the use of a plastic card and the use of a paper check to withdraw cash from a bank account, the district judge nevertheless found a controlling difference in the technical definition of "check."

Similarly, both the Oklahoma and Illinois courts placed great reliance on the definition of "check" in general commercial usage.[87] The narrow interpretive approaches

**83.** Brief for Appellant at 27 (brackets in original).

**84.** *Colorado ex rel. State Bank Bd. v. First Nat'l Bank,* 394 F.Supp. 979 (D.Colo.1975), *appeals docketed,* Nos. 75–1523, 75–1611, 75–1612, 10th Cir., 17 July 1975; *Oklahoma ex rel. State Banking Bd. v. Utica Nat'l Bank & Trust Co.,* 409 F.Supp. 71 (N.D.Okl. 1975), *notice of appeal filed,* 10th Cir., 23 Feb. 1976; *Illinois ex rel. Lignoul v. Continental Ill. Nat'l Bank & Trust Co.,* 409 F.Supp. 1167 (N.D.Ill. 1975), *appeals docketed,* Nos. 76–1083 to 76–1086, 7th Cir., 27 Jan. 1976.

**85.** *Colorado ex rel. State Bank Bd. v. First Nat'l Bank,* 394 F.Supp. at 985.

**86.** *See First Nat'l Bank v. Dickinson (Plant City),* 396 U.S. at 137, 90 S.Ct. at 345, 24 L.Ed.2d at 322.

**87.** In *Oklahoma ex rel. State Banking Bd. v. Utica Nat'l Bank & Trust Co.,* the court asserted,

> With respect to the paying of checks, the plastic card and personal identification number used in conjunction with the card to activate the defendants' CBCTs are not "checks". They do not meet the statutory

of these three courts are not supported by the *Plant City* decision, which eschewed such technical distinctions in favor of giving full effect to congressional intent.[88] When we focus upon "the conduct of the parties and the nature of their relations," [89] the mere fact that many CBCT's do not require a written instrument in the *form* of a paper check is without significance.

Even more disturbing is the Comptroller's inconsistent emphasis on form. When it suits his purpose he is quite willing to recognize that "[t]he business of banking changes with the times . . . " and suggest that the fifty-year old National Bank Act should therefore be construed in a "flexible and reasonable fashion" so as to include the operation of CBCT's within the "incidental" banking powers authorized by section 8.[90] On the other hand, he rejects the technological change from paper checks to plastic cards as a new means by which

banks "pay checks" within the meaning of section 36(f).

■ Like the form of the check, the form of the account from which funds are withdrawn is also without significance. If the CBCT withdrawal is from a savings account, while no "check" could have been drawn on the account, the cash disbursement by the CBCT is nonetheless a routine transaction like those generally carried on at the main banking office or an authorized branch. We conclude that Congress envisioned all account withdrawals when it used the shorthand phrase "checks paid" in section 36(f). If future technological innovations render paper checks totally obsolete, section 36(f) will still include within its broad standard those facilities that permit bank customers to perform the traditional banking function of withdrawing funds from their accounts.

definition of a check contained in the Uniform Commercial Code, nor are they written instruments such as were contemplated by the McFadden Act. The word "check" has a well-defined and precise meaning in the commerce of this country; indeed, "a check is foreign to the electronic environment" or CBCT. From the evidence, such a check is not *paid* as distinguished from *cashed* until it is presented to the drawee bank, verified as to amount and genuineness, the account balance is found sufficient, the amount of the check is debited, photographed and stamped "paid", or otherwise cancelled, and the check's use in commerce is thus terminated. Under the evidence in this case, such paying occurs at the chartered premises of defendant banks and therefore the Court concludes that no checks are paid at the defendants' CBCTs.

409 F.Supp. 71, 91 (N.D.Okl. 1975) (emphasis in original).

In *Illinois ex rel. Lignoul v. Continental Ill. Nat'l Bank & Trust Co.*, the Court held,

The insertion of a card into a CBCT to secure $25 packets of cash up to $100 is not cashing a check within the meaning of the UCC or in the common understanding of what constitutes check cashing. No written instrument exists and no third party designation enters into the transaction. A withdrawal at a CBCT is the functional equivalent of cashing a check only with respect to a bearer instrument presented for payment by the maker. Even this analogy breaks down when the withdrawal is made from the cus-

tomer's savings account upon which no checks could be written or when the cash is obtained through use of a credit card. The limited similarity between a CBCT cash withdrawal and the maker's cashing of a bearer instrument is not sufficient to transform the obtaining of cash by withdrawal from a checking or savings account or through use of a Master Charge card into cashing checks within the meaning of § 36(f). The foregoing analysis is equally applicable to withdrawals consummated at POS terminals.

409 F.Supp. 1167, 1177 (N.D.Ill. 1975).

**88.** The error in this overly technical approach has been highlighted by subsequent developments. Soon after the Colorado court's decision, a national bank in Tulsa opened a CBCT ten miles from its main office, but to avoid the district court's ruling, the bank did not activate the machine's deposit button. Instead, it instructed customers wishing to make deposits to insert their cards into the CBCT and obtain special, postage metered envelopes which could be placed in a new mail box installed for this purpose by the Postal Service immediately adjacent to the bank's terminal. Amicus Brief on Behalf of the Conference of State Bank Supervisors at 44.

**89.** *First Nat'l Bank v. Dickinson (Plant City)*, 396 U.S. at 137, 90 S.Ct. at 345, 24 L.Ed.2d at 322.

**90.** *See* 39 Fed.Reg. 4420 (1974) *and* 12 U.S.C. § 24 Seventh (Supp. IV, 1974).

■ The Comptroller's final two reasons why CBCT's do not pay checks—because the transaction must be verified at the bank and because, in the case of manned units, the customer is not dealing directly with the bank—have already been discussed under the *"Deposits Received"* section of this opinion.[91] The reasoning and analysis found in that section is equally applicable here. As with deposits, the customer convenience provided by the bank is unrelated to when the debtor-creditor relationship technically comes into being, *i. e.,* to when and where the transaction is verified.[92] Likewise, the use of a third-party intermediary to facilitate the transaction does not disturb the basic nature of the check cashing transaction. When we evaluate "all those aspects of the transaction that might give the bank an advantage in its competition for customers,"[93] who employs the CBCT operator is not a particularly relevant consideration. When a bank customer receives a sum of money from either a manned or unmanned CBCT, the bank has, for all purposes contemplated by Congress in section 36(f), paid a check.

### 3. *Money Lent*

With regard to the lending function of CBCT's, the Comptroller asserts,

[A] cash withdrawal from an open end credit account, such as a credit card or approved overdraft account, does not constitute making a loan at the CBCT. Such withdrawals are from an already approved line of credit, and are subject to verification that the withdrawal is within the approved line. With most unmanned CBCT's this verification takes place at the bank, either immediately with an on-line CBCT, or later with an off-line CBCT. In these circumstances the revolving credit agreement may be viewed as an original contract which establishes the loan relationship between the customer and bank. Each request by the customer for a cash advance must be verified and accepted by the bank. The transaction thus is consummated, and the loan made, when the bank verifies at its office that the credit agreement conditions are satisfied. . . . Thus no loan is made at the CBCT.[94]

These are essentially the same arguments the Comptroller advances on behalf of the other two previously discussed services performed by CBCT's. Here again he attaches great importance to the "conclusion[s] of ordinary contract law" and to subsequent (or instantaneous) verification at the bank.

As we continue to point out, the same arguments were made and rejected in *Plant City.*[95] Specifically, *Plant City* rejects the

---

**91.** *See supra* at pp. ——–——— of 175 U.S.App. D.C., pp. 938–942 of 534 F.2d.

**92.** In *Plant City* the deposits made at either the stationary receptacle or the armored car were, by agreement between the bank and its customers, not "deposits" until received and verified at the bank's main office. The Supreme Court held that this subsequent verification did not prevent deposits from being received within the meaning of section 36(f). The same reasoning clearly applies to "off-line" CBCT withdrawals. Moreover, if a CBCT is "on-line", *i. e.,* verification at the bank is instantaneous, the argument that *the bank* has not paid a check becomes even more tenuous.

Additionally, we can not accept the logical implications of the Comptroller's subsequent verification argument. Under his theory, even "tellers' windows" and traditional brick-and-mortar branches would not "pay checks" within the meaning of section 36(f) if the withdrawal transactions (effectuated by paper checks or

otherwise) at these localities were subject to verification at the bank's main office.

**93.** 396 U.S. at 136–37, 90 S.Ct. at 345, 24 L.Ed.2d at 322.

**94.** 39 Fed.Reg. 44421 (1974) (footnote omitted).

**95.** These contentions were also rejected by the Utah Supreme Court, which held that a bank loan originating at the office of an insurance agent was "money lent" by the bank at that office and, therefore, constituted unlawful branch banking. The case is significant because the Utah statutory definition of branch is identical to section 36(f). In the Utah case, the bank gave forms for automobile loans to an insurance agent who had his customers sign them after verifying their credit with the bank by telephone. The customer would then sign two checks on the bank against the proceeds of the loan, one to the automobile dealer (the seller of the car) and the other to the insurance company for coverage on the car. The bank

idea that "private contractual arrangements, binding on the parties under state law, [can somehow] determine the meaning of the language or the reach of § 36(f)." [96] Here, as with the deposit-receiving and checking-cashing functions, "the convenience to the customer is unrelated to whether the relationship of debtor and creditor is established at the moment of receipt [of the loan proceeds] or somewhat later [when the loan is verified at the bank]" [97] or somewhat earlier when the bank and its customer enter into a private contractual agreement establishing the open-end credit account (e. g., a credit card or approved overdraft account).

Two federal district courts, one in Colorado and one in Oklahoma, have concluded that CBCT's do not lend money. In reaching this determination each court adopts a rationale slightly different from the Comptroller's theory. [98] Responding to the con-

---

argued that the loan was not actually made until the checks were presented to the bank for payment. The state bank commissioner contended that the insurance agent was in fact the agent of the bank in conducting the bank's business and that the bank's credit had been extended to the customer at the insurance agent's office where the loan originated. The Utah Supreme Court concluded,

> We consider the transaction completed and the "money lent" at the time (1) the executed note and mortgage are delivered to the representative of the Bank, and whether he is an insurance agent and whether or not he is paid by the Bank are immaterial factors, and (2) the customer is authorized by the Bank to draw checks thereon.

*Continental Bank v. Taylor,* 14 Utah 2d 370, 379, 384 P.2d 796, 801 (1963). We agree with the Utah Supreme Court. When a loan originates at a place away from the main bank and its lawful branches (at an insurance agent's office or at a CBCT) and the proceeds of the loan are, at that time, distributed to the customer or to his order, for purposes of section 36(f) a loan is consummated at that time and place.

**96.** 396 U.S. at 136, 90 S.Ct. at 344, 24 L.Ed.2d at 321.

**97.** *Id.* at 137, 90 S.Ct. at 345, 24 L.Ed.2d at 322.

**98.** In the first such case, rather than adopt the Comptroller's verification-at-the-bank theory, a Colorado district court found that there was no functional difference between the use of a credit card to obtain goods and services and its use to obtain cash. Therefore, according to the court, the use of an open-end credit card account to obtain a loan from a CBCT can not constitute branch banking unless every retail establishment that accepts credit cards is also engaged in branch banking. Judge Matsch explained,

> Whether the customer obtains the prepackaged currency as a charge against his "Master Charge" account or his "Balance Plus" account, he is drawing against a prearranged line of credit. There is no apparent functional difference between this use of a bank credit card and the use of such a card to obtain cash, services, or products from a retail trader who accepts such cards. To conclude that this function of the machine is branch banking would therefore require the conclusion that any such use of bank credit cards is also branch banking.

*Colorado ex rel. State Banking Bd. v. First Nat'l Bank,* 394 F.Supp. at 985.

In the second decision determining that CBCT's do not "lend money," an Oklahoma district court seems to accept a similar contention with respect to letters of credit. There the court implied that if we accept the proposition that CBCT's lend money by advancing funds on open-end credit accounts, then every bank advancing funds on the basis of another bank's letter of credit must be considered a branch of the bank issuing the letter. *Oklahoma ex rel. State Banking Bd. v. Utica Nat'l Bank & Trust Co.,* 409 F.Supp. 71, 91 (N.D.Okl. 1975). The main thrust of the Oklahoma court's analysis, however, does not center around a comparison between CBCT's and letters of credit; instead, it focuses upon the initial agreement between the bank and the customer establishing an open line of credit. According to the court,

> the making of a loan requires the exercise of the personal judgment of a bank officer based upon credit evaluation. Terms must be negotiated and agreed to, prior to disbursement by the bank of the loan proceeds. The making of a loan is the creation of an obligation of the bank to disburse and the obligation of the borrower to repay any funds advanced which occurs at the time the terms are negotiated and instruments evidencing those terms are executed. A loan is not made at the location where only the proceeds of the loan are advanced.

*Id.* at 91. Relying on this definition of a "loan," the court concluded that the only loan involved in a CBCT withdrawal occurs when the bank and the customer enter into a contractual arrangement establishing an open line of credit. We do not follow the reasoning of either the Colorado or the Oklahoma district court.

Although neither the Comptroller nor the two district courts favoring his position have so argued, they might contend that it is difficult to distinguish between a CBCT that cashes a cus-

cerns voiced by these two courts, a recent decision from the Northern District of Illinois decided that CBCT's do lend money. As to the alleged functional equivalence between a CBCT loan and the use of a credit card to obtain goods and services (or the use of a letter of credit to obtain cash), the Illinois decision explains,

The initial difference in the function of a credit card to obtain cash at a CBCT and its use to obtain goods and services from a merchant is that the latter engenders the running of interest from the end of a predetermined period for payment, usually 25 or 30 days after receipt of a statement, while the former causes interest to run from the time of withdrawal. Although a loan may be generally defined as a contract whereby one delivers money to another who agrees to return an equivalent sum at a future time, a significant aspect of a loan is the running of interest, the charging of which is a uniform custom in the banking industry. See 7 Zollmann, *Banks and Banking*, §§ 4823, 4825.

. . . . .

The simple use of a credit card to obtain goods or services from a merchant is distinguishable from its use at a CBCT to obtain cash on two grounds. First, the bank has not established a *place* for the dispensing of the goods or services pursuant to the use of the credit card. Second, the use of the credit card to obtain goods or services from a merchant does not commence the running of interest. If payment is made within the specified payment period, no interest accrues at all.[99]

Judge Will also persuasively rejects the Oklahoma district court's definition of a "loan":

The contracts underlying the issuance of credit cards with respect to cash advances are, in effect, agreements to make small loans to the customer at some future presentation of a valid card. That agreement [by itself] does not transfer any funds and, therefore, is not a loan as urged by defendants. Nor is interest charged with the opening or establishing of a line of credit. The funds are transferred and interest commences when the CBCT disburses the [funds] . . . . That is when and where the loan is made. Many holders of bank credit cards never use them to obtain funds and, therefore, never make any loans with them although the line of credit is available.[100]

(N.D.Ill. 1975) (emphasis in original). Similarly, with regard to POS terminals, the court states,

[L]oans are also made at POS terminals. The participation of the store's employee does not cause a significant difference in the operation of these manned terminals and the unmanned CBCTs. Instead of the customer operating the machine, he presents his card to the store's employee who completes the operation. Although the actual funds received upon withdrawal from the customer's credit card account come from the store's cash on hand, the appropriate debit and credit entries are made to the customer's and store's accounts, and interest immediately starts to run on the customer's loan. Accordingly, POS terminals, as well as CBCTs, are places where money is lent to the bank's customers within the meaning of § 36(f).
*Id.* at 1178–1179.

tomer's overdraft check (written on an open-end account) and a grocery store or other retail establishment that cashes the same check. If a CBCT becomes a branch bank simply because it provides this service, on first blush one might conclude that grocery stores performing the same function also are engaged in branch banking. This conclusion, however, would be incorrect because *a bank* does not establish a grocery store as a place for disbursing overdraft loans (any more than *a bank* establishes a mailbox or a telephone as a place where its customers can make deposits or communicate account transfers). *See* text accompanying notes 72–73 *supra*. To the contrary, *the store* provides this convenience to its customers for the same reason a bank establishes a CBCT— to retain old and attract new patronage. Note also that the interest that begins to run against the customer accrues not to the benefit of the grocery store proprietor who cashes the overdraft check, but to the benefit of the bank, the would-be proprietor and establisher of any CBCT.

99. *Illinois ex rel. Lignoul v. Continental Ill. Nat'l Bank & Trust Co.*, 409 F.Supp. 1167, 1178

100. *Illinois ex rel. Lignoul v. Continental Ill. Nat'l Bank & Trust Co.*, 409 F.Supp. 1167, 1178 (N.D.Ill. 1975).

We agree with this analysis of CBCT loans. The private contract between a bank and its customer for an open-end credit card or approved overdraft account is an agreement establishing the customer's line of credit; it is not a loan. Later the customer can make loans at will (within the line of credit) at CBCT terminals. A loan is made (and "money lent") when the customer receives funds on which he immediately begins to pay interest (1) by inserting his credit card (e. g., Master Charge or Bank-Americard) into a CBCT or (2) by cashing an overdraft "check" (plastic or paper) at a CBCT.[101] When a bank reaches out to a multiplicity of localities for the purpose of making loans available through the instrumentality of its conveniently located CBCT's, that bank is engaged in the branch banking business.

### 4. Applying the Federal Definition

█ The net result of the above analysis is as follows: If a state permits its state-chartered banks to establish CBCT's for the purpose of (1) receiving deposits, or (2) paying checks, or (3) lending money, then national banks in that state also can establish CBCT's limited to the functions permitted under state law.

█ This result would hold true even in a state that prohibits branch banking, but permits the use of CBCT's since they are not considered "branches" under state law.

**101.** If the customer's balance in the debited account is sufficient to cover the withdrawal and no interest begins to run, the customer has cashed a check, rather than made a loan, at the CBCT, which is nonetheless a branch banking service. See supra at 942–945.

**102.** Sections 36(d) and 51 are quoted, in relevant part, at note 8 supra. See 12 U.S.C. § 36(c) (1970) (last sentence).

**103.** First Nat'l Bank v. Dickinson (Plant City), 396 U.S. 122, 130, 90 S.Ct. 337, 341, 24 L.Ed.2d 312, 318 (1969).

**104.** 12 U.S.C. § 36(c) (1970). A hypothetical may help clarify our holding. Suppose, for example, that the national bank in Plant City is now receiving deposits, paying checks, and lending money through the agency of several CBCT's, rather than an armored car and a shopping center receptacle. Florida prohibits

Since we hold that off-premises CBCT's are "branches" within the meaning and intent of section 36(f)'s federal definition, for each CBCT a national bank wishes to establish it must (1) file a branch application with the Comptroller, (2) secure the Comptroller's approval, and (3) satisfy the capital and surplus requirements for branches found in (a) sections 36(d) and 51 of the National Bank Act and (b) the state banking statutes.[102] Our holding, however, does not mean that national banks can not establish and operate off-premises CBCT's in a state (e. g., Florida) that generally prohibits branch banking when that state does not define CBCT's as "branches" for purposes of state law. Under section 36(c) national banks can establish and operate CBCT's ". . . when, where, and how state law would authorize a state bank to establish and operate such a branch . . . .":[103]

A national banking association may, with the approval of the Comptroller of the Currency, establish and operate new branches [i. e., CBCT's] . . . if such establishment and operation are at the time authorized to State banks by the statute law of the State in question by language specifically granting such authority affirmatively and not merely by implication or recognition, and subject to the restrictions as to location imposed by the law of the State on State banks. . . . [104]

all branch banking by state chartered banks, and we will assume that since Plant City there has been only the following change in Florida banking law: According to a recent state administrative opinion or ruling interpreting state law, CBCT's are not considered "branches" for purposes of state law. Because under these assumed facts Florida statute law does not specifically and affirmatively grant to state banks the authority to establish and operate CBCT's without complying with the state's anti-branching statute, a narrow interpretation of section 36(c) could prevent the Comptroller from approving national bank CBCT's in Florida. We reject this narrow construction of section 36(c) for two reasons. First, as Judge MacKinnon recognized in First Nat'l Bank v. Camp, 151 U.S.App.D.C. at 12, 465 F.2d at 597, the Comptroller can consider and follow the Florida administrative opinion or ruling interpreting the state's branching laws so long as that opinion

Of course, in order to secure the Comptroller's approval, national banks will have to comply with any additional restrictions on CBCT's prescribed by the Comptroller, e. g., the thirty day notice requirement and the fifty mile limit. Under the federal statutory scheme CBCT's are "branches" within section 36(f)'s federal definition; therefore, for federal purposes the state law applicable to CBCT's is a part of the "branch" banking law of that state, which is incorporated into the National Bank Act by section 36(c).

█ Insofar as branch banking is concerned, in the McFadden Act Congress elected to implement the policy of competitive equality through the banking statutes of the individual states. This limited incorporation of state law was not, however, designed to insure perfect equality between the branches of state and national banks. As the Comptroller himself recognizes, some inequalities and some competitive differences are to be expected in a dual banking system:

Where competitive differences do occur, they will be of the sort normally associated with the dual banking systems. State banks, for example, may elect not to join the Federal Reserve System and thereby frequently are permitted (depending upon state law) to keep reserves in interest bearing notes or in correspondent accounts at other banks, thus substantially reducing the costs of maintaining reserve accounts. State banks also sometimes are given higher lending limits or broader discretion in making loans. In other non-branching areas national banks

enjoy competitive advantages. These differences are inherent in a dual banking system which is fundamentally inconsistent with complete equality between state chartered banks and national banks.[105]

We recognize that sections 36(d) and 51 of the National Bank Act create a potential source of some inequality in states that do not require state-chartered banks and their CBCT's to satisfy similar capital and surplus requirements. Section 36(c) makes state capitalization requirements for CBCT's generally applicable to national banks by providing that no national bank (unless it fits under one narrowly defined exception)

shall establish a branch outside of the city, town, or village in which it is situated unless it has a combined capital stock and surplus equal to the combined amount of capital stock and surplus, if any, required by the law of the State in which such association is situated for the establishment of such branches by State banks, or, if the law of such State requires only a minimum capital stock for the establishment of such branches by State banks, unless such association has not less than an equal amount of capital stock.[106]

The converse, however, is not true, i. e., state-chartered banks and their CBCT's do not have to comply with sections 36(d) and 51 of the National Bank Act.[107] Where state capitalization requirements for CBCT's are not as strict as federal capitalization standards for "branches", national banks will be disadvantaged to whatever

does not violate the anti-branching standard imposed by the statute law of the state. Second, this narrow reading of section 36(c) would resurrect the precise form of competitive inequality which the McFadden Act was designed to cure. *See* our discussion of legislative history at p. —— of 175 U.S.App.D.C., pp. 930–932 of 534 F.2d *supra.* By manipulating their banking statutes and administrative rulings, the states would again be able to secure a competitive advantage for state banks in the field of branching, *i. e.*, under this narrow reading of section 36(c) national bank CBCT's would be subject to the state's anti-branching statute while state bank CBCT's would be ex-

empt under a permissive opinion or ruling issued by the state's banking commissioner. We refuse to frustrate legislative intent by adopting this narrow reading of section 36(c)'s language.

105. 39 Fed.Reg. 44419 (1974).

106. 12 U.S.C. § 36(c) (1970). Note one other example of imperfect equality: state capitalization standards are not applicable to national bank branches located in the same city, town, or village as the main bank.

107. Sections 36(d) and 51 are quoted, in relevant part, at note 8 *supra.*

extent the state requirements are more lenient than the minimum federal standards established by sections 36(d) and 51.

But this is not some new source of inequality threatening to disrupt the competitive balance between our state and federal banking systems. Since the McFadden Act's passage in 1927, it always has been possible for the states to create some competitive advantages for state bank branches (CBCT's or otherwise) in the area of capitalization requirements.[108] And, as the Comptroller notes, "In other non-branching areas national banks enjoy competitive advantages." [109] Notwithstanding these imperfections, the dual banking system has endured, and we see no reason to disturb that part of the system where state law still reigns supreme. Under the McFadden Act and the decisions of the Supreme Court, the states must evaluate the merits of branch banking and determine for themselves whether they wish to authorize this form of banking and, if so, when, where, and how.

## IV. INJUNCTIVE RELIEF

### A. *Irreparable Harm*

As previously mentioned, the record reveals that as of 30 June 1975, less than six months after this action was commenced, the Comptroller had received from twenty-eight different national banks, located in seventeen states, notices of intention to establish 155 CBCT's under his ruling. Eighteen of these national banks noticed seventy-two CBCT's for opening prior to 31 July 1975.[110] According to appellees,

the three individual appellee banks and at least 230 IBAA member banks are located within 50 miles of CBCTs which were noticed for opening in July. In addition, one national bank in Minnesota and one in Menomonie, Wisconsin (less than 50 miles from the Minnesota boarder) had noticed CBCTs, the establishment of which would violate the branching laws of the State in Minnesota.[111]

This court may reverse the injunction against the Comptroller's ruling, granted by the district court below, only if the district court abused its discretion. "The balancing of . . . competing claims of irreparable hardship is . . . the traditional function of the equity court, the exercise of which is reviewable only for abuse of discretion." [112] Scrutiny of the record does not persuade us that the evidence here was insufficient to support injunctive relief. Considering the number of notices of intention on file, the district court properly determined that as of 30 July 1975 the threat of irreparable harm to plaintiff-appellees was sufficient to warrant an injunction.

### B. *Public Interest*

The Comptroller contends that he and the public, not plaintiff-appellees, will be irreparably injured if the district court's injunction remains in effect. Because of the injunction, the Comptroller argues, he is unable to supervise and monitor properly the development and operation of electronic funds transfer systems (EFTS) by national banks.

To the contrary, the effect of the district court's judgment is to place the Comptroller, the states, and national banks back in their respective positions prior to the Comptroller's December ruling. Accordingly, any national bank that intends to establish and operate a CBCT must apply to the Comptroller under normal branch application procedures.[113] The Comptroller, treating CBCT's as branches, then has available

---

**108.** Of course, each state must consider whether such reductions in required capital serve the best interests of its citizens.

**109.** 39 Fed.Reg. 44419 (1974).

**110.** Stipulation of Facts No. 21 in *Independent Bankers Ass'n v. Smith*, 402 F.Supp. 207 (D.D. C.1975), App. at 47a.

**111.** Brief for Appellees at 43.

**112.** *Brotherhood of Locomotive Engineers v. Missouri-Kan.-Tex. R. Co.*, 363 U.S. 528, 535, 80 S.Ct. 1326, 1330, 4 L.Ed.2d 1379, 1384 (1960).

**113.** *See* 12 C.F.R. §§ 5.1–.14 (1975).

to him the maximum regulatory and supervisory control possible under the National Bank Act. This contrasts sharply with the minimal control which the Comptroller proposed to exercise over CBCT's under the terms of his interpretive ruling. As a result of the district court's judgment, the Comptroller now has more, not less, supervisory control over CBCT's; he retains significant regulatory authority over CBCT's as "branches".

The public interest is best promoted by the orderly continuance of a sound dual banking system. Recognizing the disruptive threat posed by the introduction of new EFTS technology without proper planning, coordination, and controls, Congress on 28 October 1974 passed an act creating a National Commission on Electronic Fund Transfers.[114] Under the Comptroller's ruling, before this new Commission would have an opportunity to evaluate the advantages and disadvantages of EFTS technology and recommend appropriate legislation, national banks would have long since established an elaborate nationwide EFTS network. Accordingly, the Commission would be forced to take into account a significant tenth factor—the considerable economic waste involved in dismantling a nationwide CBCT system. Such a *fait accompli* is hardly in the public interest. Nor is it in the public interest to permit the Comptroller to infringe upon the branch banking prerogatives of the individual states by expanding the branching powers of national banks beyond that permitted by state law.

We conclude that the injunction was issued in the public interest and was well within the equity powers and discretion of the district court.

## V. CONCLUSION

The Comptroller has not successfully distinguished this case from the facts and law of *Plant City*. His efforts to circumvent the federal definition of "branch" fail because they focus primarily upon (1) the meaning of private contractual arrangements, rather than the meaning of section 36(f), and (2) the form of CBCT transactions, rather than their substance. Both approaches are flatly contradicted by the legislative history of the McFadden Act and the Supreme Court's decision in *Plant City*. We conclude that, regardless of private contract law and superficial form, any facility that performs the traditional bank functions of receiving or disbursing funds is a "branch" of a national bank within the meaning of section 36(f) if (1) the facility is established (*i. e.,* owned or rented) by the national bank, and (2) it offers the bank's customers a convenience that gives the bank a competitive advantage over other banks (national or state) that do not oper-

---

114. Act of 28 Oct. 1974, Pub.L.No. 93–495, §§ 201–08, 88 Stat. 1508 (codified at 12 U.S.C. §§ 2401–08 (Supp. IV, 1974)). The Commission's composition includes the Comptroller, representatives of other federal agencies, representatives of the financial and business community, individuals representing the public, and officials from state agencies which regulate banks and similar financial institutions. Appointed on 6 October 1975, the Commission is charged with the responsibility to

conduct a thorough study and investigation and recommend appropriate administrative action and legislation necessary in connection with the possible development of public or private electronic fund transfer systems, taking into account, among other things—
(1) the need to preserve competition among the financial institutions and other business enterprises using such a system;
(2) the need to promote competition among financial institutions and to assure Government regulation and involvement or participation in a system competitive with the private sector be kept to a minimum;
(3) the need to prevent unfair or discriminatory practices by any financial institution or business enterprise using or desiring to use such a system;
(4) the need to afford maximum user and consumer convenience;
(5) the need to afford maximum user and consumer rights to privacy and confidentiality;
(6) the impact of such a system on economic and monetary policy;
(7) the implications of such a system on the availability of credit;
(8) the implications of such a system expanding internationally and into other forms of electronic communications; and
(9) the need to protect the legal rights of users and consumers.
12 U.S.C. § 2403(a) (Supp. IV, 1974).

ate similar facilities. Accordingly, the district court correctly determined that the Comptroller's ruling was a nullity because it violated section 36(f) of the National Bank Act and properly granted permanent injunctive relief. Without the prophylactic effect of the district court's injunction, each day appellees would have suffered further economic and competitive injury as more national banks noticed, established, and began to operate CBCT's. The district court's judgment is

*Affirmed.*